UNITED STATES of America, Plaintiff,

v.

CROCKER–ANGLO NATIONAL BANK, Citizens National Bank, and Transamerica Corporation, Defendants.

Civ. A. No. 41808.

United States District Court
N. D. California, S. D.

Nov. 1, 1963.

Robert F. Kennedy, Atty. Gen., Lyle L. Jones, Robert L. Wright, Antitrust Div., Dept. of Justice, San Francisco, Cal., for plaintiff.

Morrison, Foerster, Holloway, Clinton & Clark, Richard J. Archer, John P. Austin, Chickering & Gregory, Frederick M. Fisk, San Francisco, Cal., Cosgrove, Cramer, Rindge & Barnum, Samuel H. Rindge, Los Angeles, Cal., for defendants Crocker-Anglo Nat. Bank and Citizens Nat. Bank.

Orrick, Dahlquist, Herrington & Sutcliffe, Christopher M. Jenks, San Francisco, Cal., for defendant Transamerica Corp.

Before POPE, Circuit Judge, and SWEIGERT and ZIRPOLI, District Judges.

## PER CURIAM.

On April 3, 1963, the defendant banks (Crocker-Anglo and Citizens) entered into an agreement for merger of the two banks under the charter of Crocker-Anglo, the resulting bank to be known as Crocker-Citizens National Bank. The merger was to become effective on the day specified by the Comptroller of the Currency in his certificate. Provision was made for termination of the agreement by either party if the merger did not become effective by December 31, 1963. On May 3, 1963, application was made to the Comptroller for his approval of the merger pursuant to Title 12 U.S.C. (1963 Ed.) §§ 1828(c) and 215a. Extensive hearings were held on this application on July 30, and 31, 1963, and on September 30, 1963, the Comptroller approved the merger subject to certain prescribed conditions, and fixed November 1, 1963, as its effective date.

Thereupon, on October 8, 1963, this action was brought by the United States seeking (1) an injunction prohibiting the proposed merger, (2) a preliminary injunction against the same, and (3), an adjudication that certain earlier mergers completed by Crocker-Anglo were in violation of § 1 of the Sherman Act and § 7 of the Clayton Act, and (4) a judgment requiring defendants to take such action as is necessary and appropriate "to dissipate the effects" of the alleged unlawful activities and "to permit and restore competition in interstate and foreign commerce in commercial banking." A certificate was filed by the Attorney General under the Expediting Act, 32 Stat. 823, as amended (15 U.S.C. § 28), and the case was assigned to this court of three judges. The cause comes before us now on plaintiff's motion for a preliminary injunction.

The parties filed a stipulation, approved by the court, fixing the time for filing all briefs, affidavits, exhibits and other papers, and fixing the time for argument on the motion on October 21, 1963. Affidavits of both parties were filed, as stipulated, and at the hearing it was stipulated by the parties that the motion was then submitted to us, after argument, upon the affidavits filed and certain additional exhibits which were offered by the plaintiff and received in evidence. Such is the record before this court at this time and upon which we have reached the conclusions which we now proceed to state.

We start with the premise that the governmental policy stated in the antitrust laws is an overriding one; that the need to preserve that policy obviates any further showing of irreparable damage; and that if there is a reasonable probability that the Government will prevail on the merits we ought to preserve the status quo by an injunction. As we view the matter, the primary question we must decide is whether we can find,

upon the record now before us, that there is reasonable probability of ultimate success by the Government.

The locations of the operations of these two banks, as of April 5, 1963, are shown on the following map or chart.

*Including Head Office

COUNTY DISTRIBUTION (APRIL 5, 1963) OF:

124 BANKING OFFICES OF <u>CROCKER-ANGLO NATIONAL BANK</u>

78 BANKING OFFICES OF <u>CITIZENS NATIONAL BANK</u>

EXHIBIT 13                                    Page 9

We consider first the question as to whether the record before us shows a possible or probable violation of § 7 of the Clayton Act. The operative words of that section prohibit, in respect to corporations engaged in commerce, the acquisition of the stock or assets of another corporation "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The case of United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, settled the proposition that bank mergers are not excluded from § 7. Proceeding from that premise we pass rapidly over the question as to what is the relevant market here. The view we take of this case makes it unnecessary, so far as decision of this motion is concerned, to decide which "line of commerce" or which "section of the country" must be chosen as a basis for our inquiry as to the probable effects of this merger on competition. The parties are in disagreement as to the relevant market. The Government says that commercial banking is the appropriate line of commerce. United States v. Philadelphia Nat. Bank, supra, 374 U.S. at

356, 83 S.Ct. at p. 1737, 10 L.Ed.2d 915. It says that the entire state of California, the Los Angeles metropolitan area (Los Angeles and Orange Counties), and the San Francisco Bay Area (San Francisco, Alameda, Contra Costa, San Mateo and Marin Counties), are all sections of the country under § 7. Without discussing some countervailing arguments on these points which are made by the defendants, we assume, at this time, the correctness of the Government's contentions in these respects.

The primary question here is where do we find the competition which the merger acquisition may have the effect of lessening? Here we should have a look at the entire commercial banking picture in California. Both parties are agreed that since the middle 1930's concentration in commercial banking in California has been high. This, it would appear, has resulted in large part from the State's lack of restrictions on branch banking. Branch banking has flourished there. The following table, adapted from the Government's exhibits, shows the percentage of total deposits and of total loans and discounts of all the banks of the state held by the five largest banks.

PERCENTAGES OF TOTAL IPC [Individual; Partnership; Corporations] DEPOSITS AND OF TOTAL LOANS AND DISCOUNTS, THE NUMBER OF BANKING OFFICES, AND THE COUNTIES IN WHICH SUCH OFFICES ARE LOCATED FIVE LARGEST CALIFORNIA BANKS
December 28, 1962

| Rank | Name of Bank | IPC Deposits | Loans and Deposits | Banking Offices | |
|------|--------------|--------------|--------------------|-----------------|----|
| | | % | % | Number | Number of Counties in which Represented |
| 1st | Bank of America, NT & SA, San Francisco | 39.5 | 42.2 | 818 | 58 |
| 2nd | Security First National, Los Angeles | 13.9 | 11.2 | 273 | 13 |
| 3rd | Wells Fargo Bank, San Francisco | 10.1 | 10.3 | 143 | 23 |
| 4th | United California Bank, Los Angeles, | 7.9 | 8.8 | 150˙ | 33 |
| 5th | Crocker-Anglo, San Francisco | 7.2 | 7.2 | 122 | 29 |
| | TOTALS: | 78.6 | 79.7 | 1516 | |

If this tabulation were carried forward it would disclose Citizens to be No. 8 in rank, its percentage of deposits to be 2.5, its percentage of loans and discounts

to be 2.1, and its number of banking offices to be 78, located in 5 counties.

If the proposed merger had been completed on the date of that tabulation, Crocker-Citizens would be No. 4 in size, its percentage of deposits 9.7, its percentage of loans and discounts 9.3, and its banking offices 202, located in 34 counties. No material changes in these percentages or ranks are shown to have taken place through changes since the date of this tabulation.

It should be noted that the fact situation presented by the present record is quite different from that which was present in United States v. Philadelphia Nat. Bank, supra. In that case the merging banks were not only located in the same city and direct competitors of each other, but the result of the merger there was a significant concentration with the merged bank controlling at least 30% of the commercial banking business in the relevant area. The merger there would result in an increase of more than 33% in concentration. (374 U.S. pp. 364–365, 83 S.Ct. pp. 1742, 1743, 10 L.Ed.2d 915) Here, in contrast, the proposed merged bank, Crocker-Citizens, would have but 9.7% of the deposits in the relevant area and 9.3% of loans and discounts. As the above figures indicate, the increase in Crocker-Anglo's percentage of deposits, now 7.2%, would be only 2.5% through the addition of the deposits of Citizens. In view of these statistics and in view of the size and extent of the other banks listed in the foregoing tabulation there can be no inherent likelihood that competition will be substantially lessened, for it is readily obvious that the merger will not produce a bank controlling an undue percentage share of the relevant market, and will not result in a significant increase in the concentration of banks in that market.

In making inquiry as to what competition is involved here, we start with the fact, not here questioned, that Crocker-Anglo and Citizens are located in rather widely separated areas. Apart from the situation existing in Ventura County, to which we will advert later, there is no solid evidence that Crocker-Anglo and Citizens compete against each other. In fact, necessary inference is all to the contrary; for we must recognize the fact, noticed by the Supreme Court in United States v. Philadelphia Nat. Bank, supra, (374 U.S. p. 358, 83 S.Ct. p. 1738, 10 L.Ed.2d 915) that "[i]n banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance. * * * The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries." At the hearing before the Comptroller it was developed that the two banks had 140 depositors who had accounts in both banks. That is no proof of competition.[1] If a man living in Beverly Hills owned property in San Francisco, his having a deposit in both places would signify nothing as to these banks being in competition.

Ventura County furnishes a special and exceptional situation. As indicated on the chart first above set out, as of April 5, 1963, Citizens had a branch in that county, in a place called Thousand Oaks, population 2934. As of the last day of December, 1962, there were 30 banking offices in Ventura County of which Bank of America had 11, Security First National 9, United California 1, and First Western 1. This county has shown recent rapid growth.[2]

Shortly prior to 1963, Crocker-Anglo applied for permission to open two branches in Ventura County. This was granted and shortly prior to the hearing

---

1. In his decision the Comptroller said: "These accounts are carried with both applying banks as a matter of customers' convenience, and they are not subject to competitive bidding between these banks."

2. Total bank deposits had shown a 90.6% increase from 1956 to 1962. Population in 1962 is estimated to have increased 20% since the 1960 census.

before the Comptroller, one of these branches was opened at Ventura (population 29,114). As of September 30, 1963, the Ventura branch of Crocker-Anglo had no deposits in the usual banking sense. (It carried Dealers Reserves as deposits.) Its loans were $325,000, a miniscule percentage of Crocker's total loans. At that time the Thousand Oaks branch of Citizens had deposits of $490,000, and loans of $359,000. These too are a miniscule percentage of Citizen's totals. Ventura and Thousand Oaks are 25 miles distant from each other. On January 2, 1963, Crocker-Anglo applied for permission to establish another branch in Ventura County, at Camarillo. The letter of application stated that branches at Ventura and Oxnard could not serve the entire county, but through the Camarillo branch "it is our desire to service the entire county." On February 12, 1963, this application was disapproved by the Comptroller.

Later on, in connection with our discussion of potential competition, we shall have occasion to discuss this move of Crocker-Anglo into Ventura County. But so far as a lessening of existing competition is concerned, in view of the size and extent of the market here relevant, and considering particularly the "section of the country" here involved, we cannot hold that any lessening of competition in Ventura County through the merger would be so substantial as to call for any injunction here. Such lessening would be *de minimis*. We do not understand Government counsel to claim otherwise.

The actual competition with which Crocker-Anglo and Citizens are each involved is competition with *other* banks in their respective areas. Nearest the place where this court sits are two of the banking offices described in the record: an office of the Hibernia Bank at Jones and McAllister Streets and the Jones and Market Street branch of Crocker-Anglo across the street. That both compete for the custom of the business houses in their vicinity is self-evident. The question then is what will happen to such competition, which must be typical,[3] after the proposed merger? We perceive no evidence that it will be altered or lessened at all.

In similar manner Citizens' 66 banking offices in Los Angeles County and 9 offices in Orange County, are a part of the 659 banking offices in Los Angeles County and 110 in Orange County. The presumably active competition that these figures suggest will, we are satisfied, not be altered in any substantial respect after the proposed merger. That such is true is apparent from another phenomenon present in the California banking situation. This is the very rapid increase in recent years in the entry of new banks into the California banking field,[4] and the rapid growth and success of such banks.[5]

3. As of December 31, 1962, there were 129 banking offices in San Francisco, of which Bank of America had 55, Wells Fargo Bank 27, United California 6, Crocker-Anglo 13, First Western 4, Bank of California 3, and the Hibernia Bank 8. The remaining 10 include Pacific National Bank, Canadian Bank of Commerce, Golden Gate National Bank, Bank of Trade, San Francisco National Bank and Hong Kong and Shanghai Bank. The last five, as we notice hereafter, are recently established.

4. 17 national banks and 32 state banks, a total of 49, were chartered in the years 1960 to 1963 inclusive. And as of October 10, 1963, 21 additional new California bank applications (national and state) had been approved.

5. "California Banks: Smaller Institutions Find Their Size an Asset, Not a Liability" Barron's, June 12, 1961, pp. 13, 20. Cited to us are the cases of San Francisco National Bank, opened May 31, 1962, with assets of less than 7 million on June 30, 1962, and by June 28, 1963 it had over 45 million total resources, and Golden Gate National Bank, opened June 1, 1961, with 2 branches and resources of 34.7 million on June 28, 1963. Both banks are located in the heart of the financial district in San Francisco. Other smaller banks referred to are Pacific National and Hibernia Bank, both of San Francisco, the former showing 200% increase in deposits from 1953 to 1962, and the latter 30% increase in the same period. These are typical of a state-wide trend.

We are forced to the conclusion that so far as presently existing competition in this field is concerned, there is no showing here that the proposed merger will have any competitive effect. It is not shown that its effect may be substantially, or at all, to lessen any existing competition.

The Government asserts, however, that the merger will tend to lessen *potential* competition between Crocker-Anglo and Citizens. The Government's showing seems to indicate that this point represents its entire case. Thus the statement concerning the economic effects of the merger made by the Government's principal economist expert is as follows: "Based on these documents" [the record before the Comptroller] "it is my opinion that this proposed merger will have a substantial adverse effect upon commercial banking competition in the State of California, because of its foreclosure of *potential* competition." (Emphasis added) This statement is based upon the theory that if not permitted to merge Crocker-Anglo would enter the Los Angeles metropolitan area, and, in general, all of the area served by Citizens, by establishing *de novo* branches. So, it is said this merger would avoid the necessity of establishing such branches. Thus, it is contended, the merger will operate substantially to lessen that potential competition.

Whether there is such potential competition is a question of fact. To answer it is not easy, for it involves a forecast of probabilities. And upon this motion we are of course limited to the evidence and showing now before us.

The assertion that apart from the questioned merger Crocker-Anglo would have entered Citizens' territory through *de novo* creation of branch banks in that area is not something to be taken for granted. There must be proof to support an inference to that effect.

In some states it might be possible to infer that if a bank had been in the process of establishing branches over a wide section of the state that it would in due course extend its business through-

out the state. But those who are familiar with California know that such cannot be said here for in many respects it is like two different states not closely related to each other.

The Tehachapi mountains, south of Bakersfield, form a natural barrier between north and south California. Between these two sections there are marked differences in types of business, methods of doing business, kinds of industries and occupations, and there are wide differences in the mores of the people and even in the manner in which they dress. It is natural that large businesses in northern California should stay there, and that those in southern California should do likewise. Certain chain stores and supermarkets found in one part of the state are absent from the other.

That this is markedly true in the banking business is evidenced by the past situation of Crocker-Anglo and Citizens. The same situation is true with respect to two of the five largest banks in the state, Wells Fargo and Security First National Bank. The former has a substantial number of banking offices in 22 counties in northern California (148 as of December 31, 1962), and the latter, as of the same date, had 278 banking offices in southern California. (Security First National offices cover a somewhat larger area than Citizens as it includes San Diego and Imperial counties on the south, and Fresno, Kings and Tulare counties near the center of the state.) With respect to Wells Fargo and Security First National it is apparent that each has chosen to stay in its own section.

The question then arises what evidence is there now before us that apart from the proposed merger Crocker-Anglo would within any foreseeable period of time become a competitor of Citizens in the latter's area of southern California?

We think it is plain that before a merger may be condemned merely because its effect may be to lessen *potential* competition it must be ascertained that the potential competition is a reality, that

is to say, that there is a reasonable probability of such potential competition.

The legislative history of the 1950 amendment of § 7 of the Clayton Act makes it plain that with respect to the question of whether the effect of a merger "may be substantially to lessen competition" the proof must be that there was a reasonable probability that the merger would have the prescribed effect. As stated in the Committee Reports,[6] "[t]he use of these words means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed effect, as determined by the Commission in accord with the Administrative Procedure Act."

Of course, if the effect is to be judged only by "reasonable probability" then a *fortiori* the existence of a potential competition must be judged according to the reasonable probability of the same. To say that it would be possible for Crocker-Anglo to move by *de novo* branching into the area of Citizens is not enough. The question is, has there been disclosed a reasonable probability that such would be the case? In short, our function is not to speculate upon the basis of mere possibility.[7]

The Government asserts that the past history of Crocker-Anglo points to the probability of the suggested potential competition. Crocker-Anglo is the result of a 1956 consolidation of Crocker First National Bank of San Francisco and Anglo-California National Bank. At that time Crocker First National had two branch offices in Oakland and San

6. S.Rep. 1775. See U.S.Code Cong.Serv. 81st Cong., 2nd Sess. 1950, Vol. 2, p. 4298.

7. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, dealt with a complaint charging violation of §§ 1 and 2 of the Sherman Act. As it was decided prior to the 1950 amendment of § 7 of the Clayton Act, which was perhaps designed to alter some of the results of Columbia Steel, see United States v. Philadelphia Nat. Bank, supra, 374 U.S. at p. 340, 83 S.Ct. at p. 1729, 10 L.Ed.2d 915, we would not undertake to cite it generally as an authority for our decision here. It did, however, discuss the question of what proof would be required to establish a claim of substantial potential competition. At that time, at any rate, the Supreme Court was apparently of the view that a claim of potential competition would have to be proven by showing something more than a mere possibility of future competition and under the circumstances of that case, the Court declined to speculate on the basis of possibility. Such may well be still good law as to the *quality of evidence* required to prove the probability of potential competition. The Court there said: "The United States makes the point that the acquisition of Consolidated would preclude and restrain substantial potential competition in the production and sale of other steel products than fabricated structural steel and pipe. Force is added to this contention by the fact, adverted to above at pages 500 and 512, [of 334 U.S., at pages 1110 and 1116 of 68 S.Ct., 92 L. Ed. 1533], that United States steel does no plate fabrication while Consolidated does. By plate fabrication Consolidated produces many articles not now produced by United States Steel. We mention, as examples, boilers, gas tanks, smoke stacks, storage tanks and barges. Attention is also called to the war activities of Consolidated in steel shipbuilding as indicative of its potentialities as a competitor. We have noted, [334 U.S. 498] pp. 500-501, [68 S.Ct. 1109, pp. 1110, 1111, 92 L.Ed. 1533] supra, that this construction was under government direction and financing. We agree that any acquisition of fabricating equipment eliminates some potential competition from anyone who might own or acquire such facilities. We agree, too, with the government's position that potential competition from producers of presently noncompetitive articles as well as the possibility that acquired facilities may be used in the future for the production of new articles in competition with others may be taken into consideration in weighing the effect of any acquisition of assets on restraint of trade.

"The government's argument, however, takes us into highly speculative situations. * * * Looking at the situation here presented, we are unwilling to hold that possibilities of interference with future competition are serious enough to justify us in declaring that this contract will bring about unlawful restraint." (334 U.S. pp. 528-529, 68 S.Ct. pp. 1124, 1125, 92 L.Ed. 1533)

Mateo and Anglo-California National Bank had 46 banking offices in San Francisco and the surrounding area. Prior to that time Crocker First National had specialized in wholesale banking. From that time on Crocker-Anglo has followed a policy of expansion. Its 49 offices as of the date of that merger have now grown to 129. Some of these later acquired branch banks were acquired by merger and a much larger number by *de novo* branching. It is to be noted that the expansion program thus manifested has been, with the exception of the move into Ventura County, previously referred to, and branches in Santa Barbara County, hereafter mentioned, confined generally to the counties and areas north of the Tehachapis.

The Government claims that the record of this branching discloses a southward trend and that the history of this process discloses a steady movement which will lead into the Los Angeles area. This is not so.

The attempted showing made by the Government in support of its contention (Schedule III attached to Durlam affidavit) fails completely. It discloses a misunderstanding of the areas traditionally constituting northern and southern California. For instance, this is a list headed "Offices of Crocker-Anglo opened since *January 1, 1958 South of San Francisco*. This includes branches in Daly City, Redwood City, San Jose, Santa Clara, and Sunnyvale, all a part of the San Francisco metropolitan area. The remaining branches listed in this schedule, (with the exception of Ventura and Santa Barbara Counties, to which we shortly allude) are all north of the Tehachapis.

The Government places particular emphasis upon the establishment of branches in Santa Barbara County. It says that Santa Barbara is well toward the south of the state and that this evidences an inevitable movement into Los Angeles. We think that the establishment of branches in Santa Barbara County is to be explained by its special economic condition and through the peculiar opportunities there for banks with trust departments. There is a special reason, peculiar to Santa Barbara County, for branching there. Crocker-Anglo of course was aware of its "reputation for living elegantly and its money from the multimillionaires who made the area—especially adjacent Montecito— their playground." This "socially impeccable retirement enclave" with many "elderly widows who travel a great deal", is an unusually rich source of business for trust departments of banks.[8] Branching into Santa Barbara County presents something entirely different from a movement into Los Angeles County.

We have previously indicated the special circumstances relating to Ventura County. We cannot find that Crocker-Anglo's entry into those counties is evidence that absent the merger here involved Crocker-Anglo would probably move into such areas as Los Angeles and Orange County where Citizens principally operates.

Counsel for the Government has offered in evidence certain testimony given by the President of the Crocker-Anglo at the hearing before the Comptroller of the Currency on July 30, 1963. The offer is on the theory that this testimony would constitute an admission with respect to the question of probability of potential competition. The portions of the testimony to which attention is called are as follows: "The Comptroller: Are you prepared to state why, in your opinion, or so far as you are aware, with your knowledge of the policies of the Crocker Bank, why it has not undertaken in the past to establish itself in Southern California, particularly in the Los Angeles area?

"Mr. Solomon: We have long entertained the idea. The circumstances never seemed to be completely appropriate until

---

8. The quoted language is from an article on Santa Barbara in the New York Times Western Edition for October 25, 1963.

the origination of our negotiations with the Citizens Bank. There is nothing novel or new in our desire and intention to move south. There have been previous attempts to move in that direction.

"The Comptroller: Apart from the question of merger, as here proposed, can you tell us why, in your opinion, the bank did not seek to employ the de novo branching route into the southern part of California?

"Mr. Solomon: I cover that later in my statement in some detail." [9]

Wholly apart from this witness's testimony as to the impossibility of moving into Citizens' area the present record leaves us without any evidence that that move would be made absent the merger.

It is true that Mr. Solomon testified that they had long entertained the idea of establishing Crocker-Anglo in southern California and obviously Crocker-Anglo seized the opportunity to make the merger considering it a desirable move. Under the arrangement with Citizens it has agreed in effect to transfer to Citizens' stockholders as a part of the arrangement a bonus the equivalent of

$12,000,000; but if, as stated, Crocker-Anglo has long entertained the idea of moving into that area and during that time has made no move to establish *de novo* branches there, this in itself tends to negative the claim of a probable potential competition, in the manner asserted by the Government.[10] It confirms the existence of serious obstacles to establishment of such branches, and the unlikelihood that Crocker-Anglo would, in the foreseeable future, attempt to establish such branches.

Challenging the statement of Crocker-Anglo's president that in order to be competitive in the Los Angeles area Crocker-Anglo, if it adopted the de novo branch route, would have to establish substantially the same number of branches as those operated by Citizens, counsel for the Government asserts that becoming a competitor of Citizens in Los Angeles "could have been accomplished as the Bank of California accomplished it this year by going in and opening *an* office, a branch office, in downtown Los Angeles." (Emphasis added) Any one acquainted with Los Angeles and the

9. In the statement here referred to the witness stated: "Crocker-Anglo, however, could not enter the Los Angeles area de novo on a sufficient scale to broaden its financial base or to enable it to compete with the statewide banks. The practical problems of obtaining qualified personnel and acceptable locations, not to mention cost, are insurmountable." He discussed at considerable length the reasons why in his view to move into that area on a de novo basis and to furnish effective banking service and competition would be an insuperable task. A single or only a few branch offices could not handle the needs of customers in that extended area where business establishments are spread over a wide geographical area; —a branch in downtown Los Angeles would be available to only a small portion of businesses; it would require over seven years to train the necessary branch management personnel for a system comparable to that of Citizens, and require longer for the next top level administrative personnel which would have to be supplied because San Francisco and Los Angeles are approximately 400 miles apart, and top management could not operate from San Francisco. He estimated the cost of physical properties, of training administrative personnel, together with the loss expected during the first $14\frac{1}{2}$ months would aggregate $29,721,000. The $14\frac{1}{2}$ months is the expected period of loss in establishing a new branch in a contiguous area. He estimated the loss in this distant metropolitan area would extend for five years.

10. It is interesting that the Government's economist affiant previously mentioned asserts in his affidavit in support of his statement as to potential competition: "Crocker-Anglo is evidently on the point of moving into the Los Angeles area"; but in the same affidavit he also states that "It is clear that Citizens and Crocker-Anglo neither faced squarely, nor made a serious effort to appraise the costs and benefits in becoming more, rather than less competitive with each other and with other Los Angeles and San Francisco banks." This would seem to amount to a statement that Crocker-Anglo has given no thought to *de novo* branching in the Los Angeles area.

manner in which its business areas are sprawled across the map, would have to agree that Crocker-Anglo cannot supply any substantial competition for Citizens by establishing a branch office in downtown Los Angeles. As was pointed out at the hearing, the Bank of California is a very special institution having the unique privilege of maintaining branches in several states, at Seattle, Portland, San Francisco and Los Angeles. One branch in Los Angeles for that bank may well be worthwhile to permit it to advertise its interstate services and representation in all large metropolitan centers up and down the Pacific coast. But for the purpose of furnishing a substantial competition in such a metropolitan area by *de novo* branching it is obvious that multiple branches would be required to take care of the very considerable business communities in Los Angeles County such as Beverly Hills, Hollywood, Westwood, Burbank, Inglewood, Whittier, Glendora, Torrence, and the like, not to mention numerous centers in Orange and Riverside Counties.

We are not convinced that one such branch bank in downtown Los Angeles could represent the sort of substantial potential competition which is urged upon us here.[11]

In this case there is another special circumstance which makes *proof* of probable prospective competition by Crocker-Anglo through establishment of *de novo* branches in the Los Angeles area wellnigh impossible. Unlike a grocery chain or a hardware merchant or a steel manufacturer who can establish new outlets or plants where he wishes, Crocker-Anglo cannot establish a branch bank anywhere without approval of bank supervisory authorities. Whether the Comptroller would permit the establishment of sufficient branching in this area is so uncertain as further to throw this whole question into the field of speculation. At the time of his decision upon the application for merger the Comptroller obviously considered the five southern counties occupied by Citizens as already overcrowded with banks.[12]

We are compelled to conclude on this record that the evidence with respect to the alleged potential competition is wholly insufficient to permit us to make a finding of any lessening of competition in consequence of the merger here in question.

We hold that there is now nothing before us which would permit us to find that there was even a prima facie case that could be made or even any suggestion of doubt as to there having been a violation of § 7 of the Clayton Act. In that situation we must conclude that there is no showing here to support the issuance of a temporary injunction to preserve the status quo based upon a claim of violation of § 7.

Since the merger does not violate the Clayton Act, the possibility that it might be held to violate the more stringent standards of the Sherman Act seems most unlikely. See Times-Picayune v.

---

11. The decision of the Comptroller which of course is in no way binding upon us, contains the following statement: "A single branch office in Los Angeles obviously could not be a comparable competitive substitute for a substantial number of branches in the southern counties. Such a branch, while necessitating a very heavy capital outlay, would not be able to serve the Los Angeles area in a degree comparable with Citizens' ability to serve it. The few benefits such a single branch would produce for Crocker-Anglo would not offset the costs involved."

12. Said the Comptroller in his decision: "In the light of the existing branch coverage in these five southern counties today, it would seriously over-bank this area if the Bank Supervisory Authorities were to permit the establishment of any such number of additional *de novo* branches. Prime branch locations, or even locations that may be deemed satisfactory, are not now available in anywhere near such figures. In fact, this Office has been finding it necessary to review applications for *de novo* branches in this area most critically in order to avoid the evils of destructive competition too many branch offices would produce."

United States, 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277; Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580. We have indicated at great length the reasons for our finding that there is no existing or prospective competition that could possibly be lessened through this merger. For a like reason we hold that we do not have here any basis for a prima facie case showing a contract, combination or conspiracy in restraint of trade. And in light of the statistics previously given, it cannot be claimed that this merger would in any way tend to create a monopoly.

The Government has made an argument which we have some difficulty in understanding to the effect that we ought to hold this merger to be a violation of the Sherman Act because the results of the merger will be as harmful and as restrictive of competition as would be the results of a certain hypothetical agreement between Citizens and Crocker-Anglo. Let us suppose, proceeds this argument, that Crocker-Anglo and Citizens had entered into an agreement to the effect that neither would enter into the territory of the other for the purpose of establishing branch banks. Since such an agreement to divide up the territory would constitute a per se violation of the Sherman Act, it is argued that a similar conclusion ought to be drawn with respect to this merger.

We think this is a complete *non sequitur*. What is about to happen here is not a division of territory but rather the creation of a consolidation whereby a single successor bank will operate in both areas.[13] We cannot find any violation of the Sherman Act per se or otherwise in the record before us.

It is plain that behind the desire of defendant banks to accomplish the proposed merger is the anticipated opportunity to procure new business. As of now there are three banks in California which furnish to some degree banking services in both northern and southern California. These are Bank of America with branches in every county in the state, United California Bank with branches in all southern California counties, and in most important northern California counties, and First Western Bank and Trust Company with branches in a more limited number of counties both north and south. There are customers of California banks which have operations in both northern and southern parts of the state. Some of these desire to do their banking with one banking institution. The record shows with some detail why such customers desire to obtain that kind of banking service. Heretofore Crocker-Anglo and Citizens have been unable to supply that service; their hope to participate in it in the future is the primary reason for the proposed merger. If the merger is completed the net result will be that the state-wide banks, so called,—Bank of America, United California Bank and First Western Bank—will have competition in that field from Crocker-Citizens. The present oligopoly resulting from the operations of the three state-wide banks mentioned would thus be somewhat thinned by the entry of Crocker-Citizens into this field.[14]

13. Counsel could just as well argue that if Citizens and Crocker-Anglo continued in the future as they have in the past to operate each in its own respective territory without any agreement whatever to remain there, then since this would result in carrying on of banking in the same manner as would have been carried on under an agreement to divide the territory, this non-action by the two banks could and ought to be treated as a violation of the Sherman Act, a manifest absurdity.

14. If it were possible to point to a lessening of competition as a result of this merger, the fact of an increase of competition with existing larger institutions would not be a defense. See United States v. Philadelphia Nat. Bank, supra, 374 U.S. at p. 370, 83 S.Ct. at p. 1745, 10 L.Ed.2d 915. As we have indicated, such is not the situation here. An affidavit by an attorney for the Department of Justice, filed here, concedes that it is the position of the Department that "California needs more state-wide commercial banks."

The view which we take of this action is epitomized in the following statement in Transamerica Corp. v. Board of Governors, 3 cir., 206 F.2d 163, 169: "We agree that this quantitative analysis discloses a tremendous concentration of banking capital, and thereby of economic power, in the hands of the Transamerica group which may be unwise and against sound public policy. It may well be in the public interest to curb the growth of this banking colossus by appropriate legislative or administrative action. This, however, is not for us to decide. Our only question is whether the theory upon which the Board based its decision meets the legal tests which are required under Section 7 of the Clayton Act * * *."

Since we are of the opinion that on this hearing no prima facie case has been made, we must deny the motion for a preliminary injunction.

The Government has suggested that we might tentatively issue an injunction here and continue to consider the matter until December 31 which is the final upset date for the merger. It is also suggested that since the Government has served interrogatories in this case, which have not yet been answered, we ought to delay our decision for some further period. It is the view of this court that we should not delay a decision. The matter has been submitted upon the stipulation made by all the parties; and at the hearing it was agreed that the court had a complete record composed of affidavits filed and other exhibits offered at the hearing. The court would not be warranted in issuing an injunction holding up this matter merely to permit the Government to await answers to interrogatories in the hope that something further may turn up.

Of course, on final hearing on the merits, other proof may be forthcoming, through these or other discovery proceedings, or otherwise.

So far as the presently proposed merger is concerned, should the Government make a case on final hearing, we would be confronted with a problem of divestiture. We appreciate the difficulties presented in such a case. But those alone do not warrant a preliminary injunction. And, in any event, on final hearing we will be confronted with a problem of divestiture, since the Government asks us to undo other mergers, including that between Crocker National and Anglo-California in 1956.

Transamerica Corporation has been made a defendant here, evidently because it is alleged that it has working control of Citizens. Since we have denied the motion for preliminary injunction against the merger of the banks we find no occasion at this time to discuss the rights or liabilities of Transamerica.

Findings in accord with this opinion will be filed and thereupon an order denying the motion for the preliminary injunction will be entered.