**UNITED STATES of America, Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Appellee.**

**No. 19179.**

United States Court of Appeals
Ninth Circuit.

March 18, 1965.

Wm. H. Orrick, Jr., Asst. Atty. Gen., Robert B. Hummel, Geo. R. Kucik, attys., Dept. of Justice, Washington, D. C., Stanley E. Disney, Atty., Dept. of Justice, Los Angeles, Cal., for appellant.

Moses Lasky, Richard Haas, Joseph M. Livermore, Brobeck, Phleger & Harrison, San Francisco, Cal., L. A. Gibbons, Los Angeles, Cal., for appellee.

Before ORR, JERTBERG and MERRILL, Circuit Judges.

ORR, Circuit Judge:

On August 19, 1963, the Department of Justice of the United States issued a Civil Investigative Demand to the Union Oil Company of California. The demand recited that it was issued pursuant to the Antitrust Civil Process Act (herein ACPA), 15 U.S.C. §§ 1311–1314, and requested documents relating to an investigation of "proposed acquisitions of fertilizer companies by petroleum companies", for the purpose of "ascertaining whether there is or has been a violation of the provisions of [Section 7 of the Clayton Act]".[1]

On August 27, 1963, pursuant to Section 5(b) of the ACPA, 15 U.S.C. § 1314 (b), Union filed a petition in the United States District Court for the Southern District of California to have the demand set aside. The petition contained six grounds. It was granted upon the ground that the ACPA may not be used to investigate prospective acquisitions, which, if consummated, might violate Section 7 of the Clayton Act.

For purposes of this opinion we assume, without deciding, that the demand made was upon a "person under investigation", that it was sufficiently definite and certain, and that it otherwise constituted a proper request for the production of documents which Union may have had in its possession from which it may have been determined that Union's activities were possibly in violation of Section 7 of the Clayton Act.

The issue in this case is clearly presented. The government states in its demand that it is investigating possible violations of Section 7 of the Clayton Act by *proposed acquisitions* of fertilizer companies by petroleum companies. Hence, it appears—and the government so concedes—that it intended to investigate only Union's *proposed acquisitions*, if any, of fertilizer companies. This being so, we are presented with the question of whether the ACPA authorizes the use of the civil investigative process to inquire into proposed acquisitions to determine whether they would be prohibited by Section 7 of the Clayton Act.

In seeking an answer to this question we examine first the wording of the statute.

Section 3(a) of the ACPA, 15 U.S.C. § 1312(a), reads as follows:

"Whenever the Attorney General, or the Assistant Attorney General, in

1. The demand reads, in part, as follows: "You are hereby required to produce, to make available for inspection and copying or reproduction, and to deliver to a custodian named herein, at your principal place of business, designated above, the documentary material in your possession, custody or control described on the attached schedule, on the *28th* day of *August, 1963* at *10:00 A.M.*

"This civil investigative demand is issued pursuant to the provisions of the Antitrust Civil Process Act, 76 Stat. 548–552, Title 15 United States Code Secs. 1311–1314, in the course of an inquiry for the purpose of ascertaining whether there is or has been a violation of the provisions of Title 15 United States Code Secs. *18* by conduct of the following nature: *The proposed acquisitions of fertilizer companies by petroleum companies.*" (The italicized por-

tions were inserted into a standard form).

Attached to this demand was the following "Schedule of Documents:

"The following information is requested from the corporation for the period from January 1, 1960 to date. As used herein, 'the corporation' means the corporation to which this Civil Investigative Demand is addressed, its parent, subsidiaries, associated and affiliated companies.

"1. Each survey, study, report or other writing prepared or used by the corporation, its officers, directors or employees, which refers or relates to the maintenance or improvement of the corporation's position in the fertilizer market, including each such document relating to any acquisition, merger, sale of assets, or consolidation consummated or considered by the corporation."

charge of the Antitrust Division of the Department of Justice, has reason to believe that any person under investigation may be in possession, custody, or control of any documentary material relevant to a civil antitrust investigation, he may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such material for examination."

The section clearly imposes the requirement that the demand be for material relevant to a "civil antitrust investigation".

■ "Antitrust investigation" is specifically defined in the Act, Section 2(c), 15 U.S.C. § 1311(c), as follows:

"The term 'antitrust investigation' means any inquiry conducted by any antitrust investigator for the purpose of ascertaining whether any person *is or has been engaged in any antitrust violation.*" (emphasis provided)

Thus, it is apparent that a demand must be confined to material relevant to the ascertainment of whether or not a person "is or has been engaged in any antitrust violation". Obviously this does not include investigations of activity that will be a violation in the future.

An "antitrust violation" is defined in Section 2(d) of the ACPA, 15 U.S.C. § 1311(d):

"The term 'antitrust violation' means any act or omission in violation of any antitrust law or any antitrust order."

■ In view of the clear import of the cited provisions, the question posed is: Can a proposed acquisition be a past or present violation of Section 7 of the Clayton Act for purposes of the ACPA?

The foregoing requires a negative answer, if the word "violation" is used in a normal sense. Under Section 7 of the Clayton Act an acquisition can be a violation—a proposed acquisition cannot. That is to say, a proposed acquisition cannot be violative of the operative language of Section 7: "No corporation * * * shall acquire * * *" An acquisition itself—the taking of ownership—is the only type of conduct made illegal, the only type of conduct which may constitute a "violation" of the section.

While it is true that under Section 15 of the Clayton Act, 15 U.S.C. § 25, a proposed acquisition—a proposed violation of Section 7—may, if imminent, be enjoined by the Attorney General, this authorization does not transform a proposed violation of Section 7 into a violation. No logical contention can be made that a proposed acquisition can be made a "violation" of the Clayton Act by virtue of Section 15. That section is not a part of the substantive group of sections delineating that conduct which the Clayton Act prohibits. It gives the Attorney General power to seek, and the District Court power to grant, injunctions against "violations" of the Clayton Act, violations being set out in Sections 2, 3, 7, and 8. 15 U.S.C. §§ 13, 14, 18, and 19. A proposed acquisition is not, then, a violation of the Clayton Act.

Appellant, however, does not read "antitrust violation", as used and defined in the ACPA, to mean conduct made unlawful by the antitrust laws. It interprets the word to mean "any conduct for which the United States could bring an action and obtain relief under any antitrust law." We take a look at the reasoning employed by the government in support of its argument that the disputed language of the ACPA can reasonably be so interpreted, so as to permit proposed acquisitions to be investigated as past or present "violations" of Section 7 of the Clayton Act.

First, the government argues, pointing to the title of the ACPA, that the Attorney General's civil investigative authority is made co-extensive with his powers of civil antitrust enforcement. The title of the ACPA is: "An Act to authorize the Attorney General to compel the production of documentary evidence required in civil investigations for the

enforcement of the antitrust laws, and for other purposes." This title is generally descriptive, and is as appropriate to describe the Act, as the trial court interpreted it, as it would be to describe the Act as the government interprets it. As a matter of fact, this same title was used for all the proposed acts that were presented over a period of seven years that the government was endeavoring to get an antitrust investigative demand statute to its liking.[2] The present act, however viewed, is certainly much narrower than earlier ones proposed with the same title. There is no merit to the proposition advanced that the title is not to be given the broadest possible reading, but that it should, instead, be given the *particular* more limited reading for which the government contends. Even if the title were such that it gave real support to the government's interpretation, the provisions of an act are not embodied in its title. See Brotherhood of Railroad Trainmen v. Baltimore and Ohio Railroad Co., 331 U.S. 519, 528–529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). The type of investigation pursuant to which the ACPA may be used, a "civil antitrust investigation", is specifically defined in the Act, Section 2(c). It is to this provision, and not to the general title, that we should look. Unless there is some genuine confusion in the terms of an act, courts will not look to the title. See Strathearn Steamship Co., Ltd. v. Dillon, 252 U.S. 348, 354, 40 S.Ct. 350, 64 L.Ed. 607 (1920); Fairport, Painsville & Eastern Railroad Co. v. Meredith, 292 U.S. 589, 594, 54 S.Ct. 826, 78 L.Ed. 1446 (1934). We find no such confusion. It would be false reasoning to look to the title here, apply to it a definite interpretation, note that this conflicts with the clear terms of the statute, and from this conclude there is ambiguity in the terms of the statute.

Secondly, the government places much reliance on the fact that the trial court's interpretation of "violation" causes some distinction between the power to investigate pursuant to a possible action to enjoin an acquisition and the power to investigate pursuant to a possible action to divest. The government says that this is a purely formalistic distinction and one that should not be found in the statute. We disagree. The basic and broad distinction drawn in the statute, whether advisable or not, is clear and not inherently illogical in any way. The line was drawn between existing violations and prospective violations. There is nothing illogical in a decision to allow the former to be investigated, while leaving the investigation of the latter to traditional methods. There are still many reasons—relating to the desire to surround the grant of broad investigative powers with adequate safeguards—that can be advanced to support this distinction. Moreover, the ACPA does not direct itself exclusively to Section 7 of the Clayton Act. It applies to *other important sections as well.*[3] Thus Congress, in granting limited investigative powers and in setting up the distinction referred to, was addressing itself to the antitrust laws generally. The wisdom of its decision may perhaps be brought into question, but the clarity and coherence of its statute remain; the "artificial" distinction with regard to the enforcement of Section 7 of the Clayton Act that the government argues it set up by the ACPA does not suggest any ambiguity in the intended meaning of the phrase "is or has been engaged in any antitrust violation."

The government further contends that the courts have often viewed successful actions to enjoin consummation of mergers as having established "violations" of Section 7 of the Clayton Act, though conceding that a proposed merger has never

---

2. See H.R. 7309, 84th Cong., 1st Sess.; S. 3425, 84th Cong., 2nd Sess.; S. 716 and S. 1003, 86th Cong., 1st Sess.; H.R. 4792, 86th Cong., 1st Sess.; S. 167, 87th Cong., 1st Sess.; H.R. 6689, 87th Cong., 1st Sess.

3. See ACPA, Section 2(a), 15 U.S.C. § 1311(a). By this section the ACPA applies to violations of the Clayton Act, the Federal Trade Commission Act, the Sherman Act, and other enactments.

been held to be a violation of Section 7. It argues that "violation" as used in Section 2(c) of the ACPA can thus reasonably be read in the manner for which it contends. Three cases are cited by appellant in support of this argument. We do not, however, read these cases as giving the word "violation" a meaning different from that which is customary in this and other areas of the law. The government first cites the following language from a recent opinion of the Supreme Court of the United States in United States v. Philadelphia National Bank, 374 U.S. 321, 323–324, 83 S.Ct. 1715, 1720, 10 L.Ed.2d 915 (1963): "We hold that the merger of appellees is forbidden by § 7 of the Clayton Act and so must be enjoined * * *" That opinion as we read it gives no support for the proposition advanced that proposed acquisitions are violations of Section 7 of the Clayton Act. A reading of said opinion, as a whole, indicates that the question to which the court was addressing itself throughout was whether or not the merger, when consummated, would violate Section 7. A concluding paragraph on page 371 of the opinion, 83 S.Ct. on page 1746 begins: "In holding as we do that the merger of appellees *would violate* § 7 and must therefore be enjoined * * *" (emphasis provided). This resolves any doubt about the meaning of the language cited by appellant from the earlier part of the opinion. The government similarly quotes language from two other opinions to support its broad interpretation of "violation". In United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958), the court at page 619 enjoins the proposed merger "as violative of section 7 of the Clayton Act". Again, the opinion indicates that the merger itself and not the proposed merger "violates" Section 7: "The Court concludes that there is a reasonable probability that the merger of Bethlehem and Youngstown *would, in violation of section 7*, substantially lessen competition and tend to create a monopoly in * * *" p. 618. (emphasis provided) The casual use of the word "violation" in one paragraph in the third case cited by appellant, United States v. Crocker-Anglo National Bank, 223 F.Supp. 849, 859 (D.C.1963), similarly gives very little support to appellant's contentions. The inescapable conclusion seems to be, again, that "is or has been engaged in any antitrust violation," is straightforward, and susceptible on its face to only one interpretation.

We give substantial weight to the above meaning of the words of the statute. We look to the legislative history only to determine if that meaning would produce "an unreasonable result plainly at variance with the policy of the legislation as a whole." Takao Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922). Thus in this case, assuming that the language of the statute will bear the interpretation the government gives it, compelling evidence that the intent and purpose of Congress support that interpretation must appear in order to overcome the obvious force of a normal reading of the disputed provision.[4] An examination of the history of the ACPA discloses no such evidence.

First, the construction we have made is fortified by a look at the circumstances leading up to the introduction of the bill, S. 167, which, amended in several respects, was passed by the 87th Congress as the ACPA. The "Report of the Attorney General's National Committee to

---

4. Regardless of what view is taken of the role of a court in construing a statute, a minimum requirement would seem to be that the statute reasonably bear the interpretation that it is given—that no real stress be put upon the language by the interpretation. Cf. Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 543 (1947); Hart and Sacks, The Legal Process: Basic Prob-

lems in the Making and Application of Law 1218–26 (1958). In this case the most that can be said is that the language does not easily bear the construction that the government would place upon it, making quite onerous the burden upon the government to show that other aids to construction dictate a different result.

Study the Antitrust Laws" in 1955 gave the Justice Department the impetus to seek a bill giving the Department greater investigative authority in antitrust matters. See pp. 343–49. That report does not support the contention now made by the government as the proper scope of such investigative authority. The concern of the report was to secure for the Department of Justice adequate authority to investigate existing "violations" or "offenses". See pp. 343, 346.

In the 84th Congress a bill on the subject was introduced in the House of Representatives by Mr. Celler and introduced in the Senate by Senator Watkins.[5] Section 3(a) of the bill authorized demand of "any documentary material bearing on any antitrust investigation". "Antitrust investigation" was left undefined. No action was taken on this bill in either house.

In the 86th Congress Senator Kefauver introduced a revision of the earlier bill into the Senate.[6] His bill differed from the former bill in that it, among other changes, added two definitional sections, clarifying the scope of the bill.[7] The definitional sections comprised what are sections 2(c) and 2(d) of the present ACPA, quoted above, defining "antitrust investigation" and "antitrust violation".[8] In the same session, Mr. Celler and Senator Wiley introduced in both houses a different bill.[9] The Senate Antitrust Subcommittee of the Committee on the Judiciary reported out Kefauver's bill, and not Wiley's.[10] Due to the two definitional provisions mentioned, the concern of the Kefauver bill was only with past or existing violations, not with future violations. As a matter of fact, we find throughout the legislative history of the bill numerous statements indicating that the bill was aimed only at investigations of past or existing violations of the antitrust laws.[11] Nowhere in the history of the bill do we find any real indication that it was intended to cover investigations of proposed acquisitions.[12] The Senate passed the Kefauver bill.[13] No action was taken upon either bill by the House.

In the 87th Congress a bill that was virtually identical to the bill that had passed the Senate during the 86th Congress was introduced by Senator Kefauver.[14] Mr. Celler had abandoned his

---

5. H.R. 7309, 84th Cong., 1st Sess.; S. 3425, 84th Cong., 2nd Sess.

6. S. 716, 86th Cong., 1st Sess.

7. Sections 2(d) and 2(e).

8. 15 U.S.C. § 1311(c) and (d).

9. H.R. 4792 and S. 1003, 86th Cong., 1st Sess. Section 3(a) of the bill provides as follows: "Whenever the Attorney General has reason to believe that any organization may be in possession, custody, or control of any documentary material relevant to the subject matter of an investigation of a possible antitrust violation he may, prior to the institution of a civil or criminal proceeding thereon, execute and issue in writing, and cause to be served upon such organization, a civil investigative demand requiring such organization to produce such documentary material and permit inspection and copying."

10. Senate Report No. 451, 86th Cong., 1st Sess.

11. See for example Senate Report No. 451, 86th Cong., 1st Sess., pp. 2, 5, 6, 7; Hearing before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Senate, 86th Cong., 1st Sess., pursuant to S.Res. 57 on S. 716 and S. 1003, pp. 2, 10; 105 Cong.Rec., Part 11, pp. 14608, 14612.

12. "Violation" is nowhere used in a way that would indicate that it was meant to include proposed acquisitions. Judge Victor R. Hansen, then Assistant Attorney General in charge of the Antitrust Division, in testimony supporting the bills in the 86th Congress, gave several examples where investigatory powers were needed to help enforce Section 7 of the Clayton Act. In no example was an acquisition merely proposed; acquisitions were either completed or well under way. See Senate Hearing, supra note 11, at 11.

13. 105 Cong.Rec., Part 11, p. 14617.

14. S. 167, 87th Cong., 1st Sess.; 107 Cong Rec., Part 1, p. 142.

former bills and now introduced an identical bill in the House.[15] It was this Kefauver-sponsored bill that, modified in some respects not here pertinent, was subsequently signed into law.

The history up to this point discloses that a somewhat moderate bill—notably in the respect here relevant—had been settled upon. The inference can clearly be drawn that Section 3(a) of the bill finally passed was meant to carry a different meaning than Section 3(a) of the early, discarded bills—different in that investigations in which the ACPA could be used were consciously limited by Section 2(c) of the Kefauver bill to those inquiries conducted to determine whether a person "is or has been engaged in any antitrust violation." We find no language anywhere in the history of the former bills that indicates that the added provision, 2(c), embodying the above language is to be read in other than its literal sense.

Looking to the discussion surrounding Senator Kefauver's bill in the 87th Congress, we likewise find no compelling evidence supporting the government's contention. There are many statements that indicate that a real need existed here, that the Justice Department needed some civil investigative powers to help enforce the antitrust laws.[16] It could arguably be said that this lends some support to the proposition that the government's construction of this statute is most consistent with the purpose of this act. This line of argument loses its force, however, in light of the tremendous concern shared by the committees, and others concerned with the bill, that it be surrounded by adequate safeguards and proper limitations on its scope.[17] A real fear was expressed as to the danger of improper use of investigative power. These fears were manifested in the many protective provisions put into the act at various stages.[18] These two concerns in enacting the statute read together reflect a "purpose" of Congress not inconsistent with the interpretation we have given the statute.

The most revealing and legitimate tools of the judge engaged in an examination of the legislative history of an enactment are the reports by the House and Senate committees that consider it and report it to the respective houses. An examination of the House and Senate Reports concerned with the ACPA provides little illumination of the problem at hand, and certainly discloses no substantial support for the government's contention. Both reports contain broad language of general purpose, as well as language evidencing concern for adequate safeguards accompanying the bill. Both use much the same language as the report of the earlier Kefauver bill—concerning themselves

---

15. H.R. 6689, 87th Cong., 1st Sess.; 107 Cong.Rec., Part 5, p. 6910.

16. See for example the "Report of the Attorney General's National Committee to Study the Antitrust Laws", supra at 343–49; Senate Report No. 1090, 87th Cong., 1st Sess.; House Report No. 1386, 87th Cong., 2nd Sess.; Economic Report of the President, January, 1961, p. 61; Statement of the Section of Antitrust Law of the American Bar Association on Civil Investigative Demand Legislation, in Hearing before the Antitrust Subcommittee of the Committee on the Judiciary, House of Representatives, 87th Cong., 1st Sess., on H.R. 6689, pp. 63–67.

17. See for example the "Report of the Attorney General's National Committee to Study the Antitrust Laws", supra at 345–47; House Report No. 1386, supra note 16 at 4–5; Senate Report No. 1090, supra note 16 at 4–6; Statement of the Section of Antitrust Law, supra note 16 at 63–67.

18. A list of 10 ways in which the Congress circumscribed the extent to which civil process may be used is presented in a statement during the House debates by Mr. McCulloch, a member of the House Subcommittee which considered the bill. 108 Cong.Rec., Part 3, p. 3999. On the list was the following: "Second, the use of a civil demand is restricted to situations where a concern 'is or has been engaged' in an antitrust violation—not in some activity which may develop into a violation in the future."

with investigations of antitrust "violations".[19]

The only plausible support for appellant's position to be found in these reports lies in the following language in the House Report, at pages 5–6:

"During this period the Department of Justice had urged premerger notification legislation. Bills to enact such legislation have been pending in several Congresses. A comprehensive civil investigative demand statute would serve some of the purposes of, and hence might obviate the need for, premerger notification legislation."

Much is made of this by the government; indeed, from its brief, this seems to be the basis for its principal argument. It points out that the premerger statute, requiring that the government be apprised of certain contemplated mergers, would "afford enforcement officials a reasonable period of time to study the competitive implications of a proposed merger or acquisition in order to determine whether to seek a preliminary injunction restraining its consummation pending adjudication of its legality or illegality."[20] This would allow the Justice Department to investigate and act before the corporations are "scrambled" in such a manner that the only remedy is the drastic one of divestiture. The government's argument suggests that this function of the premerger notification bills would be furthered by the ACPA only if the ACPA allowed investigations of proposed mergers.

We are not so persuaded. The Department of Justice admitted that the ACPA and the premerger notification bills were concerned with somewhat different questions.[21] The Department desired the premerger bill in addition to the ACPA.[22] The premerger bill does not to any appreciable degree facilitate investigation of "proposed" mergers. No notice need be given until 60 days before the effective date of the merger under the bill reported to the House in the 87th Congress.[23] The required 60 days notice need not be given until after stockholder's approval so long as 60 days are allowed to elapse after notice and before the effective date of acquisition.[24] Moreover, there is some area of overlap of the ACPA with the premerger bills. The House Report quoted above provided only that *some* of the purposes of the premerger bills would be served by the ACPA. One of the purposes of the premerger bills was to allow the Justice Department to acquire information that would enable them to bring a suit to undo a freshly consummated merger before the "scrambling" was such that divestiture was inappropriate.[25] This purpose of the premerger bills is certainly served by the ACPA as we interpret it.

In the floor debates we find no persuasive indication that the position we have taken is incorrect.

The government in its argument points to a list of 29 instances, which was compiled by the Justice Department, where civil antitrust investigations were frus-

19. Senate Report No. 1090, supra note 16 at 9; House Report No. 1386, supra note 16 at 3.

20. House Report No. 486, 85th Cong., 1st Sess., reproduced in Hearings before the Antitrust Subcommittee of the Committee on the Judiciary, House of Representatives, 87th Cong., 1st Sess., on H.R. 2882, H.R. 3563, H.R. 6058, and H.R. 6698, p. 21.

21. Hearing before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Sen-

ate, 87th Cong., 1st Sess., pursuant to S.Rep. 52 on S. 167, p. 46.

22. House Hearing, supra note 16 at 53.

23. House Report No. 486, supra note 20 at 29.

24. Ibid.

25. This is necessarily so in that an acquisition will often have taken place under a pre-merger notification bill between the time of notice and the time when information has been acquired, digested, and suit brought.

trated.[26] This list does not undermine the construction we have made.[27]

Finally, the history of the bill confirms that the wording of the ACPA—specifically the wording of sections 2(c) and 2(d)—was carefully chosen. The provisions were, as we have said, definitional, and were added to clarify the scope of the bills initially considered. The ACPA, as finally enacted, is quite short. It was long deliberated and its words carefully chosen.[28] Thus it is quite significant that the phrase "is or has been engaged in any antitrust violation" makes conspicuous use of the present and present perfect tenses.[29] Likewise, conscious use was made of the word "violation". It is apparent that the Congress intended Section 3(a) of the ACPA to mean exactly what it says.

Affirmed.

MERRILL, Circuit Judge (concurring):

I would agree that acquisitions which have not progressed beyond mere contemplation or consideration or a subjective judgment to proceed cannot be made the subject of a § 1312 civil investigative demand. In the light of that proposition, "proposed acquisitions" is a most equivocal term since it may well be directed to such situations. I therefore agree that the demand in suit is not subject to enforcement and was properly set aside.

However, I disagree with the majority opinion in permitting the demand only as to an accomplished acquisition—one beyond the reach of preventive injunction. This, in my judgment, reads the Antitrust Civil Process Act with unnecessary strictness.

In my view the business of acquiring encompasses more than the formal corporate resolutions finally accomplishing the acquisition. If companies are engaged in activities leading to that end which they can under the antitrust laws be halted from pursuing I would say that they are presently engaged in the process of acquiring and accordingly are presently in the process of violating the antitrust laws.

26. Case Studies of Celler-Kefauver and Sherman Act Investigation Problems, in House Hearing, supra note 16 at 17–28, and in Senate Hearing, supra note 21 at 55–66.

27. This list was compiled and introduced simply to show that companies often have declined to cooperate fully with an investigation by the Justice Department. It did not purport to be a list of situations that would be remedied by S. 167 or H.R. 6689, then under consideration. Even so, only several of the 19 situations involving acquisitions or merger disclosed any inquiry into acquisitions merely "proposed".

28. The great scrutiny the terms of the statute underwent is evidenced by the many changes that took place in the bill from the time it was first introduced until it was enacted. Many of these were made pursuant to the recommendations of the American Bar Association. It is noteworthy that the ABA expressed no doubts as to the meaning or the propriety of Sections 3(a), 2(c) or 2(d). See Senate Hearing, supra note 21 at 98–130.

29. This conscious omission of the future tense is more significant in light of the fact that analogous demand statutes of several states use the "future" tense. For example, the civil investigative demand provision of the Antitrust Law of Hawaii—recently enacted, and drafted with the assistance of the United States Department of Justice—reads, in part, as follows: "Whenever it appears to the attorney general, either upon complaint or otherwise, that any person or persons, [has] *engaged in* or *engages in* or *is about to engage in* any act or practice by this Act prohibited or declared to be illegal, * * *" (emphasis provided) Title 24, Chap. 205A, 1961 Supplement —Revised Laws of Hawaii 1955, p. 664. See Senate Hearing, supra note 21 at 45.