Joseph A. RUSS, James Whipple, and the Covelo Indian Community of the Round Valley Indian Reservation, Plaintiffs, Plaintiff in Intervention and Appellees,

v.

Richard E. WILKINS et al., Defendants and Appellants.

No. 76–2776.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 11, 1978.

Decided Aug. 1, 1980.

Hoffman, District Judge, sitting by designation, filed a dissenting opinion.

See also, D.C., 410 F.Supp. 579.

Charles W. Getz, IV, Cal. Dept. of Justice, San Francisco, Cal., for defendants and appellants.

Michael A. McCord, U. S. Dept. of Justice, Washington, D. C., for United States, amicus curiae.

Art Bunce, Karshmer & Bunce, Escondido, Cal., James F. King, Jr. Willits, Cal., Cal. Indian Legal Services, Ukiah, Cal., for plaintiffs, plaintiff in intervention and appellees.

Before BROWNING and HUG, Circuit Judges, and HOFFMAN *, Senior District Judge.

HUG, Circuit Judge:

This action concerns the boundaries of the Round Valley Indian Reservation in Mendocino County, California, where the members of the Covelo Indian Community reside. The appellants contend that the Round Valley Indian Reservation, as established by· a Congressional Act of 1873, was reduced in size by a Congressional Act of 1890. The appellees maintain that the Act of 1890 merely authorized the sale to non-Indians of a portion of the reservation land outside certain boundaries, without altering the boundaries of the reservation.

Appellees Russ and Whipple, enrolled members of the Covelo Indian Community, killed a deer on land that was within the reservation as established in 1873, but was outside the boundaries established pursuant to the Act of 1890. The appellees were apprehended and the deer was confiscated by appellant Wilkins, a warden of the California Department of Fish and Game. The issue presented by this appeal is whether the site upon which the deer was killed is within the Round Valley Indian Reservation and thus is "Indian country," where the California fish and game laws do not apply to the Indians, at least as to non-commercial hunting and fishing.

Appellees Russ and Whipple brought this action against Wilkins and the California Director of the Department of Fish and Game, seeking damages for the value of the confiscated deer. Russ and Whipple, together with the plaintiff in intervention, the Covelo Indian Community, also seek declaratory and injunctive relief concerning the boundaries of the reservation and the

jurisdiction to regulate hunting and fishing thereon.

The court entered summary judgment, awarding to Russ and Whipple nominal damages in the amount of $10.00 as compensation for the confiscation of the deer and declared that the boundaries of the reservation are those established by the Act of 1873; that the reservation had not been diminished by the Act of 1890; and that the members of the Indian Community were ·immune from the California fish and game laws while hunting or fishing for subsistence on land within the boundaries of the reservation as established in 1873.[1] We reverse.

I

BACKGROUND

Round Valley, located in what is now Mendocino County, California, was originally set aside for Indian use in 1858 by an order of the Secretary of the Department of the Interior. The area was composed of a small, fertile valley completely ringed by coastal range mountains. On March 30, 1870, pursuant to the Four Reservations Act of 1864, 13 Stat. 39, President Grant established the Round Valley Indian Reservation by Executive Order and expanded the tract to a total size of over 31,000 acres. However, non-Indians ignored the reservation status of the land and settled upon the land within the reservation boundaries, claiming title from the State of California under the Swamp Act of 1850, 9 Stat. 519.

On March 3, 1873, Congress made a major change in the reservation, 17 Stat. 633. The southern two-thirds of the agricultural land in Round Valley, approximately 12,000 acres, was restored to the public domain, to be sold to non-Indians; and 89,000 acres of mostly mountainous land was added to the northern portion of the reservation, making the 1873 reservation approximately 102,118 acres in size. All non-Indians living within

---

* The Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. The court stated that it made no determination whether the immunity extended to non-subsistence hunting and fishing.

the new reservation boundaries were to be required to leave upon being reimbursed for their improvements out of the proceeds from the sale of former reservation land. Indians living outside the reservation were to be relocated to the new reservation. The eastern, western and southern boundaries of the reservation were specifically outlined in the Act. The northern boundary was fixed at a later date by a commission established by the 1873 Act.

Despite this congressional compromise, non-Indian settlement on reservation land continued. The movement of non-Indians from the reservation, as provided for in the 1873 Act, was never effected because sale of land within the southern portion of the valley was not sufficient to pay for the interests of non-Indians living in the new reservation, and Congress did not appropriate sufficient money to make the payments. Neither court orders nor military action could dislodge the settlers.

In 1884 a Senate committee was established to inquire into the conditions of certain Indians in California, particularly those at the Round Valley Reservation. This committee, chaired by Senator Dawes, noted in its report (Dawes Report)[2] submitted on February 27, 1885, that 97,000 acres of the reservation were occupied by non-Indians, leaving the 500–600 Indians confined to about 5,000 acres in the valley floor. Most of the non-Indian claims were without legal basis. The Indians were afraid to travel on Indian land and much of their livestock was lost or stolen. Deprived of the use of their land, these Indians became dependent upon the federal government, which supported them at considerable expense.

In response to the problems between Indians and non-Indians in Round Valley, on October 1, 1890 Congress again dealt with the reservation in "An act to provide for the reduction of the Round Valley Indian Reservation . . ." 26 Stat. 658. This legislation is the focus of the present appeal. The Act provided that a portion of the reservation was to be surveyed and allotted in separate tracts to individual In-

dians, and an additional portion of grazing and timber lands was to be set aside to be used in common by the Indians. Non-Indian claims on the land within this area selected for Indian use were to be appraised and compensated for, with payment to be made by the Secretary of the Interior, and the non-Indians were then to be removed from these lands retained for Indian use. The rest of the land was to be sold in 640-acre plots, with the proceeds from these sales to be placed in the Treasury of the United States to the credit of the Indians. The 1890 Act provided that the specific boundaries of the land reserved for the Indians would be determined by a commission composed of three disinterested persons. The commission, in carrying out this function, allotted to the Indians the southwest portion of the reservation, consisting of approximately 43,680 acres of both valley and mountain lands, to be used for farming and grazing. The surplus was offered at public sale.

The sale of land from the relinquished portions of the 1873 reservation was unsuccessful; only about 1,200 acres out of the 63,680 opened for non-Indian settlement were sold. On February 8, 1905, the unsold portions of the 63,680 acres were opened to homestead entry and settlement; the land remaining unclaimed after five years was to be sold. See 33 Stat. 706.

On February 11, 1947 the Secretary of the Interior issued an order of restoration, pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984. This order returned approximately 7,531 acres of vacant land within the relinquished parts of the reservation to tribal ownership.

## II

## THE EFFECT OF THE ACT OF 1890 ON THE BOUNDARIES OF THE ROUND VALLEY INDIAN RESERVATION

We must determine the exact boundaries of the Round Valley Indian Reservation; specifically we must determine whether the

---

2. S.Rep. No. 1522, 48th Cong., 2d Sess. 1 (1885).

Congressional Act of 1890 reduced the size of the reservation as established by Congress in 1873. The district court, relying primarily on *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), and *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), held that the Act of 1890 did not change the boundaries of the reservation, as established by the Act of 1873. *Russ v. Wilkins*, 410 F.Supp. 579 (N.D. Cal. 1976).

Between the time that the district court rendered its decision and this appeal was taken, the United States Supreme Court, in *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), again considered the tests to be employed in determining whether a Congressional Act changes or continues the boundaries of a reservation. Thus, we are assisted in our present inquiry by an additional delineation of the proper analysis to be employed in cases of this nature, which was not available to the district court.

In deciding whether the 1890 Act permanently reduced the size of the Round Valley Indian Reservation, we are guided by the pronouncements in *Rosebud*. The court stated:

The underlying premise is that congressional intent will control. *DeCoteau v. District County Court, supra*, [420 U.S.] at 444, 449, [95 S.Ct., at 1092, 1095]; *United States v. Celestine*, 215 U.S. 278, 285, [30 S.Ct. 93, 94, 54 L.Ed. 195] (1909). In determining this intent, we are cautioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 [, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129] (1973), *quoting Carpenter v. Shaw*, 280 U.S. 363, 367, [50 S.Ct. 121, 122, 74 L.Ed. 478] (1930); *see also Mattz v. Arnett, supra*, [412 U.S.] at 505, [93 S.Ct., at 2258]. The mere fact that a reservation has been opened to

settlement does not necessarily mean that the opened area has lost its reservation status. *Mattz v. Arnett, supra; see also Seymour v. Superintendent*, 368 U.S. 351, [82 S.Ct. 424, 7 L.Ed.2d 346] (1962). But the "general rule" does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary. *DeCoteau v. District County Court, supra*. In all cases, "the face of the Act," the "surrounding circumstances," and the "legislative history," are to be examined with an eye toward determining what congressional intent was. *Mattz v. Arnett, supra*, [412 U.S.] at 505, [93 S.Ct., at 2258.]

430 U.S. at 586–87, 97 S.Ct. at 1363. Thus, our inquiry, as mandated by *Rosebud*, 430 U.S. at 588 n.4, 97 S.Ct. at 1363, consists of an examination of *all* the factors which reveal congressional intent.

In the present case, the meaning of the language of the 1890 Act is best analyzed by reference to the circumstances that existed at the Round Valley Indian Reservation prior to enactment of the 1890 Act and by reference to the legislative history of that Act. *See Rosebud*, 430 U.S. at 588 n.4, 97 S.Ct. at 1363. Using this analysis, we conclude that the Act of 1890 evidences a strong congressional intent to change the boundaries of the Round Valley Indian Reservation so as to reduce its size.

A. *Surrounding Circumstances and Legislative History Leading to the Enactment of the 1890 Act.*

Congressional intent to disestablish a portion of the Round Valley Indian Reservation in 1890 is clear from a review of the circumstances surrounding the Round Valley Indians and the legislative history of the 1890 Act. The history of the reservation is one of constant friction between Indians and non-Indians and encroachment by non-Indians upon reservation land, an intrusion which the government was unable to curtail. This encroachment deprived the Indians of the use of their land and of the means by which they could provide for themselves. Consequently they became dependent upon the federal government for

subsistence. The Act of 1890 was an attempt to remedy this situation by reducing the reservation to a manageable size, removing the non-Indians from the lands retained for the Indians, securing the reduced reservation for the exclusive use of the Indians, and opening the remaining portion of the former reservation lands for sale to non-Indians who were then able to obtain legitimate title to the land.

The 1885 Dawes Report concerning the Round Valley Indian Reservation clearly outlined the need for the 1890 legislation. The Dawes Committee "found the greater part of the reservation in the possession of several white men,"[3] who grazed livestock on the upland portion of the reservation. The 500–600 Indians were confined to approximately 3,000 acres of valley land and 1,000–2,000 acres of grazing land. The occupancy by non-Indians was without compensation for the use of the land, and, in most cases, was without valid title to the land. The Committee stated that these non-Indians were making large profits from the use of reservation land and concluded that non-Indian occupancy of reservation lands was valued at $30,000 a year, which was a direct loss to the Indians and the federal government. The Committee reported that the full reservation embraced "land productive and well calculated for the production of everything necessary for the support of many more Indians than are now to be found in the State of California."[4] However, the Committee found that the Round Valley Indians were so confined in the use of their land that they could not maintain sufficient herds of livestock to sell for a profit, or even to provide for their own subsistence. Thus, the federal government had been obligated to pay for the support of the Indians upon the reservation since 1873. In some cases, the Indian Agency had purchased cattle for the Indians' consumption from the same non-Indians who were illegally using the Indians' lands. The Dawes Report stated that this outlay of government money for support of the Indi-

ans was alone "a sufficient commentary upon the folly which has marked the administration of the reservation during this time."[5]

The Dawes Committee reported that attempts to expel the non-Indians had been feeble and unsuccessful. The 1873 Act concerning Round Valley would have required non-Indian settlers to leave the reservation upon receipt of payment for improvements which they had made upon Indian lands. However, sufficient funds to pay the settlers were not generated from the sale of former reservation lands; nor did Congress appropriate sufficient funds to make the payments. Thus, the non-Indian settlers refused to leave. The Committee reported that a lawsuit concerning title to 1,080 acres within the reservation had been decided against the federal government.

The Dawes Report recommended that:

[T]he earliest measures should be taken to reduce the boundaries of this reservation to the present wants of these Indians. . . . A few thousand acres of valley land, with perhaps a small portion of upland for grazing purposes, is all that can be utilized for their benefit. To these needs the limits of the reservation should be reduced, and all Indians capable of taking care of themselves should be put upon a sufficient amount of this valley land, each in severalty, and in quantity sufficient for his support.

. . . . .

[I]t is the duty of the Government to take these Indians and their reservation in hand, and, after having reduced the reservation to their present wants and prospective development and apportioned to each one all his necessities, require the balance of the reservation to be sold and the money put into the Treasury for the benefit of these or other Indians. . . 

. . . . .

These Indians are now so far advanced that a little care and the proper disposi-

3. *Id.* at 2.

4. *Id.* at 3.

5. *Id.*

tion of them upon a portion of this land will result in making them not only self-supporting, but . . . useful members of the community.[6]

The Committee recommended that measures should be taken at once to complete the appraisals and payments to non-Indians for their improvements, as required by the 1873 Act, and stated that, if necessary, the Army should be used to remove those non-Indians. It is clear that the Dawes Report, in suggesting a solution for the problems existing at Round Valley Indian Reservation in 1885, recommended reducing the size of the reservation. It proposed the establishment of a smaller reservation, which would more closely correspond to the needs of the Indians, could be properly managed by the federal government, and could be secured for the Indians against encroachment by non-Indians.

The findings and recommendations of the 1885 Dawes Report were largely the basis for the legislation regarding the Round Valley Indian Reservation that was considered by Congress during the period from 1886 to 1890. In January, 1886, President Cleveland sent a message to Congress containing a proposed bill, "To provide for allotments of lands in severalty to the Indians residing upon the Round Valley Reservation, in the State of California, and granting patents thereof and for other purposes."[7] The message was accompanied by a report from the Secretary of the Department of Interior and the Commissioner of Indian Affairs. The Commissioner's report referred to the findings contained in the Dawes Report and quoted verbatim the Committee's recommendations including the statement that "measures should be taken to reduce the boundaries of this reservation to the present wants of these Indians." The Commissioner concurred in the Committee's recommendations and urged passage of the bill. Also included in the 1886 message to Congress was a petition from 145 Round Valley Reservation Indians requesting that the government regain title to the "swamp lands" within the reservation which a federal court had decided were lawfully held by non-Indians under disputed grants from California, and give allotments of the land to the Indians. The Indians' petition outlined the problems caused by the non-Indian settlers. The specific provisions of the 1886 bill were similar to those of the law finally enacted in 1890. The 1886 legislation was approved by the Senate, but failed to pass in the House.

In 1888 President Cleveland sent a strongly-worded message to Congress along with a bill "to provide for the reduction of Round Valley Indian Reservation, in the State of California, and for other purposes."[8] Attached to the President's message was a lengthy report from the Secretary of the Interior which included a detailed summary of the situation at Round Valley from the Commissioner of Indian Affairs and numerous pieces of correspondence from various agencies, including the United States Army, the United States Attorney's Office, the Department of War and the Department of the Interior, which agencies had dealt with the situation at Round Valley. The Commissioner's report reviewed the history of the reservation and the non-Indian encroachment upon Indian land, as had the Dawes Report, and added further information underscoring the need for congressional action. The Commissioner's report noted that repeated efforts had been made, using both the military and the courts, to dislodge the settlers, but to no avail. The report stated that a federal circuit court in 1880 decided that three of the settlers had valid title to "swamp lands" under a grant from the State of California and that the settlers were not required by the 1873 Act to vacate the reservation lands until they were paid for their improvements. The report further stated that in

6. *Id.* at 7–8.

7. H.R.Exec.Doc. No. 21, 49th Cong., 1st Sess. 1 (1886).

8. H.R.Exec.Doc. No. 33, 50th Cong., 1st Sess. 1 (1888).

1887 the Army was deployed to evict all non-Indian settlers from the reservation, but the Army was stopped by an injunction issued by a state court. The Commissioner's report quoted a letter from General Howard to the War Department regarding the situation at Round Valley which stated:

> Most of the intruders have grown rich, arrogant and insolent in their high-handed encroachments upon the land set apart for the exclusive use and benefit of the Indians. Congressional legislation looking towards a settlement has been defeated in committee.
>
> .     .     .     .     .
>
> The agency cattle are driven off and the agency herder forbidden to "work" his cattle on their ranges.   .   .   .
>
> .     .     .     .     .
>
> I recommend new legislation, and that in it some other method be taken to compensate claimants and intruders than by continuing them and their herds within the boundaries of the reservation.[9]

The Commissioner also quoted the 1885 Dawes Report's recommendation. The Commissioner's report concluded that:

> [w]ithout further legislation nothing will be accomplished and the present 'extraordinary and disgraceful state of affairs' will be continued for another generation.[10]

However, the 1888 bill also failed to pass in the House.

A draft of the bill which was finally approved by the legislators was sent to Congress in 1889 by President Harrison. The President referred to the draft as a bill "to provide for the reduction of the Round Valley Indian Reservation in the State of California, and for other purposes."[11] It was accompanied by a report from the Secretary of the Interior that referred to the Commissioner's report, which had been sent to Congress with the bill proposed in 1888. That Commissioner's report had set out the history of intrusions upon the Round Valley Indian Reservation and cited the recommendations of the Dawes Report. This bill was passed by both Houses of Congress without amendment and without much debate. The bill was reported out of both the House and Senate Committees on Indian Affairs without comment. The only congressional debate on the bill was held in the House during which the representatives briefly discussed the bill's provisions for land allocation and method of payment. There was no discussion as to boundaries or jurisdiction.

These circumstances surrounding the enactment of the 1890 Act and its legislative history indicate that Congress, in passing the 1890 legislation, was seeking to solve a very specific problem that existed at the Round Valley Indian Reservation. Following the recommendation of the Dawes Committee, the congressional solution was to reduce the Round Valley Indian Reservation to a smaller size, which would correspond more appropriately to the needs of the Indians and would be easier for the federal government to manage and preserve for Indian use. The 1890 Act was designed primarily to set aside a reserve exclusively for Indians which would not be encroached upon by non-Indians. The Act accomplished this goal by authorizing a commission to reduce the size of the reservation, allot reservation land to the Indians, remove non-Indians from the reserve established for the Indians, and offer the remaining land for sale. The purpose of the 1890 Act was to solve a problem for the Indians, not to provide surplus reservation land for settlement by non-Indians. The sale of land to non-Indians in Round Valley was incidental to Congress's primary intent of setting aside and preserving a new, smaller reservation for the Round Valley Indians. To have allowed the reservation to remain at its 1873 boundaries would not have accomplished the separation and consolidation needed to solve the problems at Round Valley.

---

9. *Id.* at 13–14.

10. *Id.* at 15.

11. H.R.Exec.Doc. No. 72, 51st Cong., 1st Sess. 1 (1889).

## B. *The Face of the Act.*

The district court determined that the language used in the Act of 1890 was not synonymous with discontinuation, abolishment or cession, and thus did not terminate reservation status of the disputed lands. *Russ v. Wilkins*, 410 F.Supp. at 582. However, when read in light of the legislative history of the Act and the surrounding circumstances, the wording of the 1890 Act clearly shows that the intent of Congress was to establish a smaller manageable reservation and to discontinue the reservation status of lands opened for sale to non-Indians.

The provisions of the 1890 Act may be summarized as follows:

1. The Act directed that the agricultural lands be surveyed into ten acre tracts to be allotted to the Indians severally. The President was given the discretion to allot these parcels in such quantities and to such classes of Indians belonging on the Round Valley Indian Reservation as he deemed expedient and for the best interest of the Indians. Sufficient agricultural land was to be reserved for agency, school and mission purposes.

2. The Act further directed that a reasonable amount of grazing and timber lands be reserved for the use of the Indians in common. The President was also given discretion to allot these lands in individual parcels in severalty as he deemed expedient for the best interest of the Indians. These grazing and timber lands were to be selected by a Commission of three disinterested persons appointed by the President.

3. The Act specified that the Commission was to appraise and the Secretary of Interior was to pay for certain lands and improvements "within the reservation, as hereby established." The payments were to be based upon the following:

a. The value of all agricultural land which had been acquired by individuals as a result of a purchase from the State of California together with the value of the improvements on those lands. (This took care of the non-Indians who had purchased land from the State of California under the Swamp Act.)

b. The value of improvements only on the agricultural land or common land which had been reserved for the Indians under the terms of this Act. (This took care of reimbursing non-Indians for the value of the improvements they had placed on land to which they did not have title.)

4. The Act provided that the remainder of the grazing and timber lands "in the reservation as at present existing" be surveyed into tracts of 640 acres each and the "boundary lines of the *reserved* lands shall be run and properly marked." (Emphasis added). The 640-acre parcels were to be appraised together with any improvements on them. The parcels were then to be sold at not less than the appraised price, and not less than one dollar and a quarter per acre. A person having appraised improvements on a parcel had a preference right to purchase at the appraised price.

5. The net proceeds derived from the sale of the lands, after payment of expenses of the survey, appraisement and sale, and reimbursement for the payments made to non-Indians for the lands and improvements, were to be placed in a fund in the United States Treasury to be used for the Indians.

The circumstances surrounding the enactment of the 1890 Act indicate that the solution to the problems at Round Valley necessitated reduction and consolidation of the reservation and a complete separation of Indian lands from non-Indian settlements. The language used by the 1890 Act was precisely directed to that purpose. The words of section 2 of the 1890 Act emphasize a distinction being made by Congress between "the reservation as established under the act of Congress approved March third, eighteen hundred seventy-three" and the *"reservation, as hereby established."* (Emphasis added). At another point in section 2 the 1890 Act refers to the *"reservation as herein established."* (Emphasis added). The language of section 3 of the 1890 Act further indicates this distinction be-

tween the 1873 reservation and the reservation established by the 1890 Act in providing: "That the remainder of the grazing and timber lands included in the *reservation as at present existing* shall be surveyed into tracts of six hundred forty acres each, and the boundary lines of the *reserved* lands shall be run and properly marked." (Emphasis added). There would be no need to use the qualifying phrase "at present existing" if the reservation were to retain its then current boundaries.

■ The use of the word "reduction" in the title of the 1890 Act ("An act to provide for the reduction of the Round Valley Indian Reservation . . . and for other purposes"), reinforces this indication of congressional intent to disestablish a portion of the reservation as recommended by the Dawes Committee. Although the title of the Act cannot enlarge or confer powers or control the words of the Act, the title may be helpful in interpreting ambiguities within the context of the Act. *Cornell v. Coyne*, 192 U.S. 418, 430, 24 S.Ct. 383, 385, 48 L.Ed. 504 (1904); *see United States v. Union Oil Co.*, 343 F.2d 29, 32 (9th Cir. 1965). The clear intent of the statute is shown by the words "reduction of the Round Valley Indian Reservation." The use of these words in the title of the Act is a reflection of the recommendations of the Dawes Report that "measures should be taken to reduce the boundaries of this reservation to the present wants of these Indians." [12]

The living pattern of the Indians and non-Indians at Round Valley did not suggest that Congress needed or intended to continue reservation status on the relinquished lands. The lands opened for sale were largely within one contiguous body and were not inhabited by Indians. Non-Indians were removed from that portion of land reserved for the Indians. Thus, discontinuance of reservation status of the relinquished land did not jeopardize the Indians' use of the reservation lands specifically set aside to meet the Indian needs, because all non-Indians were removed. It therefore did not, at the time, result in a "checker-

board" jurisdiction between the state and federal government that was sought to be avoided. *See DeCoteau*, 420 U.S. at 428, 95 S.Ct. at 1084; *United States v. Long Elk*, 565 F.2d 1032, 1039 (8th Cir. 1977); *City of New Town, North Dakota v. United States*, 454 F.2d 121, 126 (8th Cir. 1972); *cf. Rosebud*. By defining a smaller, manageable reservation and removing the non-Indians from that reservation, the Indians were better served than by a larger reservation that was dominated by non-Indians whom the government had been unsuccessful in removing. This was the major purpose of the 1890 Act.

The district court indicated that the lack of a specific delineation of the boundaries of the reservation within the Act militates against finding a termination of a part of the reservation, 410 F.Supp. at 583. However, in our view, the congressional decision to set up a commission to establish boundaries, rather than to outline them within the Act itself, is immaterial to the issue of whether or not the reservation status of the land was continued. The method of defining the boundaries does not appear to us to relate to the purpose for which the boundaries were set.

The 1890 Act, when read as a whole and viewed against the background of the legislative history of the Act and the circumstances surrounding its enactment, evidences a congressional intent to reduce the size of the reservation, to consolidate and secure it for the Indians and to terminate the reservation status on the remaining lands that were opened for sale.

C.  *Subsequent Legislative and Administrative Interpretations of the Act.*

■ Legislative and administrative interpretations of the 1890 Act, made contemporaneously with enactment or shortly thereafter, also indicate that Congress intended to reduce the size of Round Valley Indian Reservation and to disestablish that portion of the reserve opened for sale. Interpretations of a statute by those charged with administering and enforcing it, and their

12. S.Rep. No. 1522, *supra*, note 2, at 7–8.

practices which reflect their understanding of the provisions they must implement, have been given deference by courts when faced with a problem of statutory construction. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). This is particularly true when the interpretation is a contemporaneous one, made soon after the time of enactment. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964).

The instructions issued by the Acting Commissioner of the Office of Indian Affairs to the three-person Round Valley Reservation Commission which was established by the 1890 Act reveal the Commissioner's understanding that the boundaries of the reservation were to be redefined and the size of the reservation reduced. In a November 3, 1890 letter from P.V. Belt, Acting Commissioner of the Office of Indian Affairs, to the three members of the Commission, Belt set out the duties imposed by the Act of 1890.[13] Belt stated that the three-person commission should "appraise the value of all improvements made by private persons or firms before the 3rd day of March, 1873, upon any of the lands included in the reservation . . . *and within the lands selected by you to be retained for the Indians*." (Emphasis in original).[14] The letter also refers to the "[s]election of timber and grazing lands for the diminished reservation."[15] In assessing the overall effect of the 1890 Act, Belt stated:

> The manner in which this reservation has been controlled and possessed by white men, has been a standing reproach to the government for many years. The passage of the Act of October 1st, 1890, was urged by this Office, with a view to securing the tillable land of the reservation to the Indians in severalty, and of placing the Indians in undisturbed and sole use and occupation of a sufficient quantity of timber and grazing lands, the intruders to be driven from such lands.[16]

The Round Valley Reservation Commission Report itself also indicates the Commissioners' understanding that their responsibility was to reduce the size of the reservation. The majority report outlined the Commission's duty to appraise pre-1873 improvements upon land "*within the land selected . . . to be retained for the Indians*" (emphasis in original) and the Commission established the Eel River as the western boundary of the "territory to be retained" for Indian use for grazing and timber.[17] The minority report, specifically mentioned reservation boundaries.[18] In the minority report, Commissioner Hunt commented on the duty of "establishing the line and marking off the boundaries of the new reserve" and expressed his desire "to settle the boundaries of the new reservation."[19] He referred to the majority report's decision to "take within the new Reservation from 40 or 45 thousand acres" of upland, while he recommended taking only "25 or 30 thousand acres . . . for the new reserve."[20]

Other administrative documents reflect a congressional intent to reduce the size of the reservation in 1890. The Round Valley Reservation Commission selected approximately 43,680 acres of land for the new reservation from the approximately 102,000-acre reserve established in 1873. In the 1890 Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior, the acreage listed for the Round Valley Indian Reservation was 102,118 acres, as

---

13. Letter from P.V. Belt, Acting Commissioner of the Office of Indian Affairs, to Round Valley Reservation Commission (November 3, 1890).

14. *Id.* at 2–3.

15. *Id.* at 4.

16. *Id.* at 8.

17. Report from D. W. Shryock, Chairman, Round Valley Indian Commission, to Commissioner of Indian Affairs 2 & 9 (March 10, 1891).

18. Report from H. C. Hunt, Member, Round Valley Indian Commission, to Commissioner of Indian Affairs (undated, 1891).

19. *Id.* at 3.

20. *Id.* at 4–5.

established by the 1873 Act.[21] However, in the 1891 Annual Report, issued after the work of the Round Valley Reservation Commission had been completed, the acreage for the Round Valley Indian Reservation was listed as 43,680 acres, as established by the 1890 Act.[22] Although appellees contend that acreage tables were often reduced to reflect the land allotted to Indians, this factor could not have been responsible for the acreage reduction at Round Valley between 1890 and 1891 because no acreage had been allotted.

A letter from the Commissioner of Indian Affairs to the Secretary of Interior, dated March 30, 1892, stated that:

> Round Valley Commission, with its report dated March 10, 1891, submitted a plat which they certified to correctly show the exterior boundaries of the Round Valley Indian Reservation as reduced under the provisions of the act aforesaid to be as follows [description follows]. . . .
>
> .   .   .   .   .
>
> The report of the Commission fixing the boundaries of the reservation as above described was approved by the Department by letter dated July 8, 1891.[23]

In the 1893 Annual Report of the Commissioner of Indian Affairs, the Commissioner stated that:

> Since the last annual report of this office a Commission was appointed by the President to appraise the grazing and timber lands and improvements thereon included in the Round Valley Reservation as established under the act of March 3, 1873 (17 Stats., 633) [17 Stat., 633], but outside of the limits of the reservation as diminished by section 2 of the act of Congress approved October 1, 1890 (26 Stat., 658).
>
> .   .   .   .   .

The said lands are to be restored to the public domain and sold at public sale at a price not less than the appraised value, the proceeds of said sale to be placed at the credit of the Indians.[24]

Although appellees cite other administrative documents indicating some ambiguity among officials, it appears clear from the statements of the Round Valley Reservation Commission and from the Commissioner of Indian Affairs, who were charged with the primary responsibility of administering the 1890 Act, that it was their understanding that Congress intended to reduce the size of the reservation.[25]

**D. Subsequent History of State and Federal Jurisdiction.**

In *Rosebud*, the Supreme Court noted that the subsequent jurisdictional history of the area was an important factor for consideration. The subsequent jurisdictional history of this area reinforces the view that reservation status terminated on the lands beyond the boundaries established under the 1890 Act. The record reveals that the federal government has not exercised jurisdiction over the land relinquished by the 1890 Act, and the State of California has exercised jurisdiction over this area.

■ Subsequent congressional references to the Act of 1890 also support the conclusion that Congress intended to reduce the size of the reservation. Consideration is given to subsequent legislation declaring the intent of a previous enactment. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *C. Sands Sutherland, Statutory Construction*, § 49.11, (4th ed. 1973).

---

21. Fifty-Ninth Annual Report, by Commissioner of Indian Affairs to Secretary of Interior (1890).

22. Sixtieth Annual Report, by Commissioner of Indian Affairs to Secretary of Interior (1891).

23. Letter from Commissioner of Indian Affairs to Secretary of Interior 2–4 (March 30, 1892).

24. Sixty-Second Annual Report, by Commissioner of Indian Affairs to Secretary of Interior, 34–35 (1893).

25. In 1938, the Solicitor of the Department of Interior issued an opinion, which stated that the restoration clause applies both to lands which are part of an existing reservation and to lands which were part of a reservation at the time the land was opened for sale. *See* 56 I.D. 330, 333 (1938).

In 1905, Congress passed "An Act To open to homestead settlement and entry the relinquished and undisposed of portions of Round Valley Indian Reservation, in the State of California, and for other purposes." 33 Stat. 706. The Act stated in part:

That all lands relinquished from the Round Valley Indian Reservation, in the State of California, under an Act entitled "An Act to provide for the reduction of the Round Valley Indian Reservation . . ." approved October first, eighteen hundred and ninety, which have not heretofore been disposed of, shall be surveyed . . .. The said lands when surveyed and appraised shall be subject to settlement and entry under the provisions of the homestead laws.

By referring to the lands affected by the 1905 Act as the portions "relinquished" under the 1890 Act which provided for a "reduction" of the reservation, it is clear that the 1905 lawmakers understood that the 1890 Act had reduced the size of the reservation.

References to the 1905 Act in the congressional debates confirm this understanding. In reporting the 1905 bill to the House of Representatives, the Committee on Public Lands stated in its report that "[t]he lands affected by this bill were originally a part of the Round Valley Indian Reservation." [26] Also, during debate in the House, the bill's sponsor, Representative Bell, stated:

I desire to state to the Members of this House that this bill . . . has passed the Committee on Public Lands of the Senate unanimously. It is a meritorious bill. A few men have gone in and settled upon the lands that were *cut off from the* [Round Valley] *Reservation* in California about fourteen years ago. This bill is for the purpose of giving these men the right to perfect title by paying whatever the land shall be appraised for.

The money, when it is paid into the United States Treasury, is to be credited to the Indians of the Round Valley Indian Reservation. (Emphasis added).[27]

During a later debate on the bill, Mr. Bell also stated:

In 1890 the Congress of the United States came to the conclusion that the *reservation was too large and ought to be reduced, and on the 1st day of October, 1890, a law was passed in Congress reducing the reservation* and authorizing the President of the United States to allot to the Indians in severalty as much agricultural land as he thought they should have, and also timber and grazing lands. After that allotment had been made by the President of the United States there remained some 64,000 acres of land cut off from the reservation. . . . [O]n the 19th day of April they were offered for public sale but only 1,200 acres out of some 64,000 acres were sold. (Emphasis added).[28]

References made by other congressmen to the bill mention a "sale of reservation lands." [29] But, these references are ambiguous since they may refer either to land presently considered part of the Round Valley Indian Reservation or to former reservation land.

In 1947, pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984, the Secretary of the Interior restored 7,531 acres of the unsold lands severed from the Round Valley Indian Reservation by the Act of 1890. The Secretary acted pursuant to both § 3 and § 7 of the Act. Section 3 authorized him to restore to tribal ownership unsold, opened lands and § 7 authorized him to add other lands to existing reservations. Thus, we cannot conclude from the Secretary's order whether the Secretary viewed his actions as a restoration of lands which retained their reservation status or as an addition of land which had previously been terminated from the Round Valley Indian Reservation.

---

**26.** H.R.Rep. No. 2370, 58th Cong., 2d Sess. 1 (1904).

**27.** 38 Cong.Rec. 5849 (1904).

**28.** 39 Cong.Rec. 398–99 (1904).

**29.** 38 Cong.Rec. 5849 (1904); 39 Cong.Rec. 398–403 (1904).

## III

## CONCLUSION

Appellees argue that the "reduction" of Round Valley Indian Reservation was not meant to decrease the size of the reservation because the 1890 Act was passed at a time when the prevailing government policy was to assimilate Indians into the culture of the non-Indian settlers; and thus, the approach of the allotment system was to allot reservation land severally to Indians and to sell the surplus to settlers within the reservation, while leaving the original reservation boundaries intact. Although the rationale for the allotment under some statutes was to promote the integration and assimilation of Indians into non-Indian culture, this was not a goal of the 1890 Round Valley legislation. To the contrary, the intent of Congress was to provide the Indians with a separate reserve where they would be secure from non-Indian encroachment. The Act of 1890 removed the non-Indians from the reservation, rather than integrating them with the Indians, because of the problems which had occurred in the past on that reservation.

■ It is clear to this court that the intent of Congress in enacting the 1890 Act was to reduce the size of Round Valley Indian Reservation and to abolish reservation status of the opened lands. This intent is shown by the circumstances existing at Round Valley prior to 1890, by the legislative history of the Act, and by the language of the Act itself which was designed to meet the specific situation at Round Valley. The particular problems of the Round Valley Indians required a solution that reduced, consolidated and secured the reservation for the exclusive use of Indians, and that opened and relinquished lands for sale to those who sought legitimate title to the land. The Act of 1890 was enacted to effect this solution.

REVERSED.

HOFFMAN, District Judge, dissenting:

The persuasive effect of an excellent majority opinion makes it difficult to dissent.

The ultimate question is, of course, the effect of the Act of 1890, 26 Stat. 658, upon the admitted establishment of the Round Valley Indian Reservation by the Act of 1873, 17 Stat. 633. If the Act of 1890 disestablished the rights of the tribe to the previously established boundary lines created by the Act of 1873 (except for approximately 43,860 acres of both valley and mountain lands which were admittedly still reserved as the Round Valley Indian Reservation by the Act of 1890), then the majority is correct in its analysis of the problem. If however, the effect of the Act of 1890 was merely to "open up" the 63,680 acres for non-Indian settlement, or if the Act of 1890 is ambiguous as to its effect, then the district court must be affirmed.

## I

I start with the premise that, as a general rule, ambiguities in legislation affecting retained tribal sovereignty are to be construed in favor of the Indians. *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Washington v. Yakima Indian Nation*, 439 U.S. 463, 484, 99 S.Ct. 740, 753, 58 L.Ed.2d 740 (1979); *Mattz v. Arnett*, 412 U.S. 481, 504–505, 93 S.Ct. 2245, 2257–58, 37 L.Ed.2d 92 (1973), in which case the Supreme Court said:

> "Congress was fully aware of the means by which termination could be effected. But clear termination language was not employed in the . . . Act. This being so, we are not inclined to infer an intent to terminate . . . . A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."

## II

The question as to whether the Act of 1890 so divorced the 63,680 acres from "Indian Country" as defined by 18 U.S.C. § 1151, and thus terminated that area as a part of the Indian reservation under the jurisdiction of the United States Government as created by the Act of 1873, is not so

readily determined as the majority opinion suggests. There are indeed, implications which suggest a termination, but in my judgment too much ambiguity exists as to what Congress intended at the time of the passage of the Act of 1890. As stated in *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909), "when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." And a congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history. *Mattz, supra* 412 U.S. at 505, 93 S.Ct. at 2258; *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *United States v. Nice*, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed 1192 (1916). In *Mattz*, the Supreme Court quoted with apparent approval the language from *United States ex rel. Condon v. Erickson*, 478 F.2d 684, 689 (8th Cir. 1973), by noting "a holding favoring federal jurisdiction is required unless Congress has *expressly or by clear implication* diminished the boundaries of the reservation" opened to settlement. In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977), decided after the district court opinion in the instant case, the requirement was restated as "a congressional determination to terminate an Indian reservation must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."

My analysis of the operative language in the 1890 Act does not persuade me that, at least on its face, there was any congressional intent to disestablish the Round Valley Indian Reservation. In fact, but for the title or caption which states "An act to provide for the *reduction* of the Round Valley Indian Reservation, in the State of California, and for other purposes"[1] (emphasis supplied), I find little or no indication of such an intent to terminate the "Indian Country" as to the 63,680 later surveyed, appraised and put up for public sale. Indeed, Section 3, relating to the 63,680 acres, refers to the "reservation as at present existing", and there are no such words appearing in the Act of 1890 which point to "disestablishment", "discontinuance", "abandonment", "relinquishment", "termination", "cession", "sell", "vacate", "surrender", "abolish", and words of like import, of any portion of the Round Valley Indian Reservation as created by the Act of 1873.

Judge Renfrew, in his opinion, reported at 410 F.Supp. 579 (1976), has cogently pointed out his reasons why the use of the word "reduction" did not operate to terminate the "Indian Country" in the area where the deer was killed by Russ and Whipple, the two enrolled members of the Indian tribe. He correctly suggests the analogy to *United States v. Erickson*, 478 F.2d 684 (8th Cir. 1973), where the operative language of an Act of 1908, 35 Stat. 460, made reference to "reservations thus diminished," and the Eighth Circuit found that "diminished" merely referred to the area allotted to the Indians.

The Act of 1873 had the effect of reducing the size of the previously existing Round Valley Indian Reservation under Section 1 of the Act where Congress provided that the southern area be "restored to the public lands of the United States", and thereafter sold. Section 2 of the 1873 Act creates a new reservation by metes and bounds description. Section 3 provides that the President shall cause to be withdrawn from sale or entry under the homestead and pre-exemption laws, the entire area specified by metes and bounds under Section 2, and likewise states that all settlers now residing upon the tract (consisting of ap-

---

1. The title of a statute is not a part of that statute and cannot alter the plain meaning of the text. *Railroad Trainmen v. B. & O. R. Co.*, 331 U.S. 519, 528–529, 67 S.Ct. 1387, 1391–1392, 91 L.Ed. 1646 (1947); *United States v. Union Oil Co.*, 343 F.2d 29, 32 (9th Cir. 1965). The word "reduction" is susceptible to two interpretations, one which does actually reduce the Reservation and alter its boundaries; the other merely reducing the amount of land within the Reservation held *exclusively* by Indians. Cf. *Bryan v. Itasca County*, 426 U.S. 373, 384 n.11, 96 S.Ct. 2102, 2108, 48 L.Ed.2d 710 (1976).

proximately 102,000 to 106,000 acres) be required "to remove therefrom" as soon as they shall be paid the appraised value of any improvements then existing. Thus, the Act of 1873, in clear and unmistakable language, (1) restored a portion of an existing Indian Reservation to the *public* lands, (2) created by metes and bounds an Indian Reservation which was encompassed within the former Reservation, and (3) caused an affirmative act by the President to withdraw from sale or entry the area created under (2).

Matters affecting jurisdiction were relatively unimportant in the period from 1873 to 1890, and for some years thereafter. In 1953, Congress enacted 18 U.S.C. § 1162 and, under (a), California was given jurisdiction over offenses committed by or against Indians in all areas of Indian country within that state, but under (b) there is a specific disclaimer of jurisdiction with regard to state regulation of Indian hunting, trapping or fishing rights. Since the confiscation of the deer grew out of the hunting rights reserved to Indians, the jurisdiction issue is of prime importance in this case.

Three years prior to the enactment of the controversial Act, i. e., the Act of 1890, Congress enacted the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. § 331, *et seq.* The majority places major emphasis on the Dawes Report of 1885 which does recommend that the Round Valley Indian Reservation boundaries be altered. My analysis of the Dawes Report is that it led to the passage of the General Allotment Act of 1887,[2] and not to the Act of 1890. Congress, confronted with its action in 1887, was not persuaded to disestablish a portion of the Round Valley Reservation in order to make it available for non-Indian settlement. As the Supreme Court said in *Mattz, supra,* 412 U.S. at 496, 93 S.Ct. at 2253:

"That Act [the General Allotment Act of 1887] permitted the President to make allotments of reservation lands to resident Indians and, with tribal consent, to sell surplus lands. Its policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished. Unallotted lands were made available to non-Indians with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways."

Thus, Congress could open a portion of the Reservation to non-Indian settlement without altering its reservation status and allot the remainder to the Indians. Since, in 1885, there were only an estimated 500 to 800 tribal Indians in the Reservation, it is a fair assumption that Congress concluded that all lands would soon be allotted, the trust would expire, and the reservation could be abolished. *Mattz,* 412 U.S. at 496, 93 S.Ct. at 2253. It was in this setting that the Act of 1890 was enacted. It is my view that the Dawes Report of 1885 led to the passage of the General Allotment Act of 1887, but furnishes no basis for concluding that the disestablished recommendations in the report prompted the passage of the Act of 1890. In this respect, I have a substantial difference of opinion from that of the majority.

The United States was not to purchase any portion of the Reservation under the 1890 Act. In Section 3, the United States was to act solely as a trustee for the Indians in selling a portion of the Reservation to non-Indians. Stated otherwise, the land sold would pass from the Indians through private purchases, but it was not first made a part of the public domain. Under the

---

**2.** The General Allotment Act was known as the "Dawes Act". It was enacted in an attempt to reconcile the Government's responsibility for the Indians' welfare with the desire of non-Indians to settle upon reservation lands. *DeCoteau v. District County Court,* 420 U.S. at 432, 95 S.Ct. at 1087. Congress, in the years prior to

1890, was thoroughly familiar with appropriate disestablishment language as evidenced by *DeCoteau* and the contrary language as reflected by *Mattz* and *Seymour,* the latter two cases being unilateral in character as is the present controversy.

1873 Act, it is noted that certain lands were expressly "restored to the public lands of the United States", with the proceeds of any sales "hereby restored" being used to pay for the improvements or claims of settlors within the "new Reservation" and for the improvement of Indians on the restored lands. The funds derived from sales under the 1873 Act were not credited to the Indians as a whole, as contrasted to the 1890 Act where the proceeds were "placed in the Treasury of the United States to the credit of said Indians". While it is true that *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 588, 97 S.Ct. at 1364, tends to minimize the effect of any changed method of payment, the Supreme Court merely stated that such a factor was "not conclusive with respect to congressional intent". Nevertheless, it still remains a factor for consideration. Indeed, as far as *Rosebud* is concerned, I agree with its analysis as stated by the Eighth Circuit (the same court which previously decided *Rosebud*) in *United States v. Long Elk*, 565 F.2d 1032, 1036–1039 (8th Cir. 1977), which emphasized that *Rosebud* was decided on two crucial factors: (1) that the Act contained cession language "precisely suited" to disestablishment, and (2) the legislation originated in an agreement between the tribe and the Government unequivocally calling for the cession of reservation lands. Neither factor in *Rosebud*, I submit, is present in this case.

Finally, California urges that Section 2 of the Act of 1890 uses the words "the reservation as hereby established" and "the reservation as herein established", which would tend to indicate an intent to establish a new reservation for the Indians. But these words must be read in conjunction with prior words in the same section which refer to "within the lands selected and retained for the Indians" which words assuredly do not constitute clear disestablishment language. Aside from the words used by Congress, it is important to realize the population situation in the Round Valley Indian Reservation prior to 1890. While in

many Indian reservations throughout the country there existed "familiar forces [of a] nearby and growing population of white farmers, merchants, and railroad men . . urging authorities in Washington to open the reservation to general settlement",[3] such was not the situation in Round Valley as reflected by the fact that only two buyers appeared when the 63,642 acres of Round Valley were offered for sale on April 19, 1894, thus leaving 98% of the opened land unsold because of lack of interest. Additionally, trespassers had occupied a large portion of the reservation lands created by the 1873 Act and had not moved therefrom despite the mandate of the Act of 1873. Congress knew all of these facts prior to the passage of the 1890 Act as there were references to same during the House floor debate. Congress responded, in an attempt to ameliorate the existing conditions which included bloodshed and inter-racial violence, by designating specific and discrete zones of Indian and non-Indian occupancy on the reservation as created in 1873. The "establishment" which Congress had in mind was a rearrangement to accommodate the three conflicting interests which were apparent at the time.

I respectfully submit that the face of the Act of 1890 does not demonstrate any expression to terminate.

### III

As commanded by *Rosebud* and other authorities, it is required that we look to the "legislative history". Other than the Dawes Report heretofore mentioned, bills were introduced in 1886 and 1888 during the administration of President Cleveland but which failed of passage. The 1886 bill provided "for allotments of lands in severalty to Indians residing upon the Round Valley Indian Reservation . . . and for granting patents therefor, and for other purposes." In all probability the 1886 bill did not pass because of the pendency of the

**3.** *DeCoteau v. District County Court*, 420 U.S. 425, 431, 95 S.Ct. 1082, 1086, 43 L.Ed.2d 300 (1975).

General Allotment Act which was enacted on February 8, 1887. In 1888, a new title was needed because the reference to "allotments" in the 1886 bill was no longer needed due to the enactment of the General Allotment Act. The 1888 bill picked up Senator Dawes' non-specific reference to "reduction" as contained in his 1885 report. After the General Allotment Act, the policy was directed at extinguishing Indian title to opened lands only if and when such lands were actually purchased by settlers. See Letter of Commissioner to Secretary of Interior, August 10, 1934, referring to policy starting about 1890 and continuing until at least 1910.

I do not find from the pre-1890 legislative history any clear intent to disestablish the reservation set forth in the 1873 Act.

IV

After 1890, Congress again addressed the Round Valley Indian Reservation matter in 1904 when a bill was presented with a title "To *open* to homestead settlement and entry the *relinquished* and undisposed of portions of the Round Valley Reservation" (emphasis supplied).

This bill, finally enacted on February 8, 1905, 33 Stat. 706, was made necessary because only 1223 of the 63,642 acres opened by the Act of 1890 were actually sold as the 1890 Act required sales in parcels of 640 acres and payment had to be made in full. The bill reduced the size of the parcels to 160 acres and allowed the purchasers to pay in five equal annual installments. The legislative history demonstrates that at least Congressman Livernash of California clearly considered the opened lands as a part of the Round Valley Indian Reservation, 39 Cong.Rec. 5849, 58th Cong., 2nd Sess., although the Senate Report, No. 2618, 58th Cong., 2nd Sess., implies that the opened lands were no longer a part of the reservation where it states "the lands affected by this bill were originally a part of the Round Valley Indian Reservation." Here, the title to the bill, for what it may be worth, operates to the benefit of the Indians.

The legislative history of the 1905 Act is inconsistent and confusing. In any event, it does not demonstrate any clear intent by Congress to diminish the Reservation or to suggest that the 1890 Act had already done so.

We come to the Indian Reorganization Act of 1934, 48 Stat. 984, as amended, 25 U.S.C. § 461, *et seq.* Under Section 3, the Secretary of Interior is authorized to "restore to tribal ownership the remaining surplus lands of any Indian reservation opened before June 18, 1934, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States." Section 7 provides that the Secretary is authorized to "proclaim new Indian reservations on lands acquired pursuant to any authority conferred by [this Act], or to add such lands to existing reservations." The legislative history of the 1934 Act (S.Rept. No. 1080, 73d Cong., 2d Sess., H.Rept. No. 2049 (Conference Report), 73d Cong., 2d Sess., the latter adopting the Senate version of Section 7) makes reference to the interplay of Sections 5 and 7. Section 7 permits the Secretary "to proclaim new Indian reservations on lands acquired" with the Senate Report adding "pursuant to section 5 of the bill". When one examines Section 5, it states that the Secretary is authorized to "acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands  .  .  ., within or without existing reservations,  .  .  . for the purpose of providing land for Indians." Section 3 contains no authority to "acquire" lands and it deals only with the restoration of surplus lands to tribal ownership.

In the Opinion of the Solicitor, 54 I.D. 559 (1934), the Round Valley Reservation was listed as eligible for restoration of lands under Section 3 of the Act of 1934. In 1938, the Solicitor of the Department of Interior attempted to clarify the 1934 opinion by stating that Section 3 does not mean the lands must now have the character of Indian reservation lands and need not be located within the geographical limits of an Indian reservation. 56 I.D. 330, 333 (1938).

On November 18, 1946, a memorandum from the Assistant Commissioner of Indian Affairs to the Secretary of the Interior was submitted. It recommended that the unsold lands be restored to tribal ownership and, at one point, stated that the unsold lands should be "added to" the Round Valley Reservation. The Secretary approved the memorandum as being an operative order; there does not appear to have been any separate restoration order entered by the Secretary.

I do not feel that the 1947 secretarial order purportedly "restoring" 7531 acres of unsold lands to the Round Valley Indian Reservation has any effect on the case. California argues that it suggests that the Act of 1890 definitely took this acreage away from the reservation. On the other hand, the memorandum indicating the purpose of the "Order of Restoration" was "to add to the said Round Valley Reservation all lands which remain vacant and undisposed of on the open portion of the said reservation", thus implying that its purpose was merely to restore possessory rights which had been divested by the Act of 1890.

### V

*Rosebud* stresses the importance of a Presidential Proclamation which, in *Rosebud,* "is an unambiguous, contemporaneous statement by the Nation's Chief Executive, of a perceived disestablishment of Gregory County [from the Rosebud Reservation]". As noted by Mr. Justice Rehnquist speaking for the majority, "It reflects, we believe, the clear import of the congressional action in the 1904 Act." *Rosebud,* 430 U.S. at 602–603, 97 S.Ct. at 1371. Likewise, in *De-Couteau* and *United States v. Southern Pacific Transp. Co.,* 543 F.2d 676, 693 (9th Cir. 1976), there are references to presidential proclamations which use the words reflecting that the Indians had "conveyed . . . all their title and interest in and to all the allotted lands" and "have ceded and relinquished . . . all their right and claim in and to all the lands . . . which have not been allotted, selected, set apart and reserved". And in *Long Elk,* the presidential proclamation used no words of termination or disestablishment with the Eighth Circuit suggesting that this was an indication that there was no intention to terminate a portion of the reservation.

As to the Round Valley Indian Reservation, there was no presidential proclamation or any formal executive order implementing the Act of 1890. The Act itself mentioned no boundaries but merely set aside a "reasonable amount" of land for the exclusive use and allotment to Indians.

While the absence of a presidential proclamation is not *per se* conclusive, it is rather significant to note that in the majority of cases holding that reservation lands have not been disestablished, there was either no presidential proclamation, as in this case and *Mattz,* or the proclamation contained no words akin to disestablishment language and merely stated that portions of the reservation would be opened to entry and settlement, as in *Seymour, Erickson, Long Elk,* and others. Thus, it appears that courts have placed major emphasis on the wording of the presidential proclamations to reflect the congressional intent.

### VI

It is quite true, as the majority notes, that California has probably exercised more jurisdiction over the area covered by the 1890 Act than has the federal government. The duties of the federal agent were directed to the management of parcels of land held in trust by the United States, either for individuals or for the Indians collectively. He agreed that no significance could be attached to the line which California now contends was the post-1890 exterior boundary of the reservation. The State game warden testified that he enforced California's fish and game laws against all violators, except as enrolled members of the Covelo Indian Community on lands held in trust by the United States. He determined the trust status of land by reference to a map furnished by the Bureau of Indian Affairs—not by any boundaries of the reservation. The line purporting to be a boundary line indicated nothing to him.

**932**

It is apparent that, in the exercise of jurisdiction, no official, state or federal, historically paid any attention to any exterior boundary. Their interest was whether a particular area was in trust status.

The very nature of the 60% of the Reservation which was opened for settlers by the Act of 1890 suggests that only hunting and fishing could be a "justifiable expectation" of use by Indians and non-Indians alike. The Congressman for that area described the opened lands as "rugged and mountainous and hardly habitable for human beings". While post-opening jurisdictional history of reservation lands opened to non-Indians is a factor usually considered, such as in *Rosebud* and *DeCouteau* where "justifiable expectations" on the part of non-Indians were upheld, this case presents no such "justifiable expectation" as there has never been a demand for the rugged and mountainous land which was opened to settlers in 1890.

At best, the exercise of jurisdiction by California has been essentially limited to occasional visits by a game warden in the surrounding hills. While it may be conceded that this exceeds the exercise of jurisdiction by federal authorities, it is extremely doubtful whether this is sufficient in law to have any bearing on this case, especially since this case involved hunting rights. *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan*, 493 F.2d 564 (9th Cir. 1974).

As noted, by the order of 1947, a total of 7531 acres, in random small parcels of 140 acres each, were restored to Indian use in 1947. This presents the problem of "checkerboard jurisdiction" which was denounced in *Seymour*, 368 U.S. at 358, 82 S.Ct. at 428, and *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 478, 96 S.Ct. 1634, 1643, 48 L.Ed.2d 96 (1976). In *Long Elk*, 565 F.2d at 1039 (8th Cir. 1977), the court observed that law enforcement officers would be required to consult tract books to determine the locus of a criminal act, and "such an impractical result is not to be imputed to Congress without specific language to that effect."

I do not now believe that the surrounding circumstances are sufficient, despite the limited post-1890 exercise of jurisdiction, to establish a clear congressional intent of disestablishment.

## VII

Mindful of the fact that there are statements found in letters and documents tending to show that there are persons who believed that a portion of the Round Valley Indian Reservation had been disestablished by the Act of 1890, I nevertheless submit that confusion existed at that time, and continues to exist, as to the true congressional intent. Certainly, as stated in *Long Elk*, 565 F.2d at 1040, there was no "hard evidence necessary to overcome the general presumption against an intent to disestablish a reservation." I respectfully dissent.